Jill GAVLE, Petitioner, Appellant,

v.

**LITTLE SIX, INC., a foreign corporation d/b/a Mystic Lake Casino, et al., Respondents.**

No. C0–95–133.

Supreme Court of Minnesota.

Oct. 31, 1996.

---

## OPINION

GARDEBRING, Justice.

This case is a tort action filed by appellant Jill Gavle against Little Six, Inc. (LSI) and three of its officers. The suit alleged several tortious acts, including sexual harassment, pregnancy and racial discrimination, civil rights violations and other torts, arising from her employment with LSI. The trial court granted LSI's motion for summary judgment, holding that sovereign immunity barred Gavle's claims against LSI. The court of appeals affirmed, concluding that the trial court had both subject matter and personal jurisdiction over LSI, but agreeing with the trial court that sovereign immunity was a bar to the suit. We affirm on the basis that, while state courts may have concurrent jurisdiction with tribal courts in civil matters arising both in and outside of Indian country, the sovereign immunity of the Shakopee Mdewakanton Sioux (Dakota) Community extends to LSI and is a bar to this suit in state court. ·

The Shakopee Mdewakanton Sioux (Dakota) Community (the Community) is a federally recognized Indian tribe. LSI, a tribal business entity incorporated under the Community corporate ordinance in 1991, has issued one share of stock owned by all voting members of the Community. LSI is registered with the state of Minnesota as a foreign corporation transacting business within the state. LSI owns a gambling casino which is in Mdewakanton Indian Country.[1]

The Community has, through the corporate ordinance, granted certain privileges and protections to LSI:

4.11 A Corporation wholly owned by the Community may assume any or all of the Community's rights, privileges and immunities (including, without limitation, sovereign immunity) concerning federal, state or local * * * jurisdiction to the same extent that the Community would have such rights, privileges, and immunities if it engaged in the activities undertaken by the Corporation.

4.12 A corporation wholly owned by the Community, shall have the power to sue and is authorized to consent to be sued in the Judicial Court of the Community, and other courts of competent jurisdiction * * *.

Shakopee Mdewakanton Sioux Community Corporation Ordinance §§ 4.11, 4.12 (amended, July 27, 1994). In turn, LSI's articles of incorporation set out the purpose of the corporation and limit both the reach of immunity extended by the Community and the extent of the corporation's ability to consent to be sued:

3.0 Purposes and Powers. The purposes for which the Corporation is organized are to engage in any lawful act or activity * * * [which seeks] to improve the business, financial or general welfare of the Corporation, the Members of the Corporation, and the Community.

3.1 Sovereign Immunity of Corporation. The Shakopee Mdewakanton Sioux Community confers on the Corporation all of the Community's rights, privileges and immunities concerning federal, state and local * * * jurisdiction, and sovereign immunity from suit * * *. Such immunity shall not extend to actions against the Corporation by the Community or Members of the Corporation.

3.2 Consent to Sue and be Sued Required. The Corporation shall have the power to sue and is authorized to consent to be sued in the Judicial Court of the Shakopee Mdewakanton Sioux Community or another court of competent jurisdiction; * * *. Consent to suit by the Corporation shall in no way extend to the Community, nor shall a consent to suit by the Corporation in any way be deemed a waiver of any of the rights, privileges and immunities of the Community.

Articles of Incorporation of Little Six, Inc. §§ 3.0, 3.1, 3.2 (Mar. 18, 1991) (hereinafter Articles of Incorporation). ·

LSI employed Gavle as a security guard from March 1992 to January 1993. Her job

1. "Indian Country" includes land within Indian reservations, dependent Indian communities, and Indian allotments. 18 U.S.C. § 1151 (1994).

included duties at the casino (in Indian Country) and at LSI's temporary administrative offices at the Canterbury Downs complex in Shakopee, Minnesota. While Gavle's complaint details many incidents, alleged to be tortious, that occurred at the casino, it also contends that some of the allegedly tortious acts took place away from the casino, in or near Shakopee.[2]

■ At the heart of this case is the issue of whether tribal business entities are subject to the application of state civil law in state court. To answer this question, we must analyze two related legal concepts— jurisdiction and sovereign immunity. Though it is sometimes said that state or federal courts are deprived of jurisdiction through the application of tribal sovereign immunity, the concept is more properly thought of as an affirmative defense, to be asserted by a tribe, tribal official or tribal entity as a bar to a particular lawsuit. Further, there are instances when a state or federal court may have jurisdiction over a matter involving a tribe or tribal entity, but may choose to stay its action, deferring to the concurrent jurisdiction of a tribal court. Thus, we must consider four related yet discrete issues:

a. Do Minnesota courts have jurisdiction over a tribal business entity in a civil tort matter involving actions occurring both within and outside of Indian country?

b. If Minnesota courts have such jurisdiction, must they stay their exercise of that jurisdiction in consideration of concurrent tribal court jurisdiction, under the doctrine of "infringement"?

c. If Minnesota courts have such jurisdiction and choose to exercise it, is such a suit nevertheless barred by tribal sovereign immunity?

d. If sovereign immunity would otherwise be available in this case, has it been waived by LSI's registration with Minnesota's Secretary of State as a foreign corporation?

---

2. Gavle's allegations of injury involve actions by defendants Leonard Prescott, Allene Ross and William Johnson, corporate officers of LSI, but those individual claims are not at issue here.

## Historical Background

To provide context for our discussion of these complex issues, we begin with some discussion of the historical relationship of Indian tribes to the state and federal governments. There are over 500 federally recognized tribes in the United States. David H. Getches, Charles F. Wilkinson, Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 4 (3rd ed. 1993). Felix S. Cohen's commentary best describes the historical relationship between the United States and Indian tribes:

> Indian policy is marked by idealistic periods such as the first years of the Republic, when Congress pledged that 'the utmost good faith shall always be observed toward the Indian,' and the 1930's, when a commitment was made to revive tribal governments. Other eras were less altruistic: the period of removal, when hundreds of tribes were evicted forcibly from their ancestral lands; the allotment era, which resulted in the loss of ninety million acres of tribal lands; and the termination period, when more than one hundred tribes were stripped of the federal-tribal relationship and, in most cases, of their land.

Felix S. Cohen, *Handbook of Federal Indian Law* 49 (1982 ed.) (hereafter Cohen, *Federal Indian Law* ).

■ In general, the federal government has viewed the Native American more as a "political entity" than as a racial minority.[3] Thus, until 1871 the United States recognized Indian tribes as possessed of the attributes of nationhood and, accordingly, concluded treaty agreements with them. *Cherokee Nation v. Hitchcock,* 187 U.S. 294, 305–06, 23 S.Ct. 115, 119, 47 L.Ed. 183 (1902). For over one hundred years however, this country has systematically brought the various Indian tribes under the auspices of the federal government as "domestic dependent nations." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). In exchange for ceded

---

3. Getches, et al., *Federal Indian Law* at 8.

land, the federal government gave Indian tribes special status that only Congress may remove. Indian tribes are not states; nevertheless, they possess a kind of sovereignty superior to that of states but inferior to that of the federal government. *Stephens v. Cherokee Nation,* 174 U.S. 445, 484–86, 19 S.Ct. 722, 736–37, 43 L.Ed. 1041 (1899); *see Colliflower v. Garland,* 342 F.2d 369, 374–76 (9th Cir.1965). They are "subordinate and dependent nations possessed of all powers as such" and limited only "to the extent that they have expressly been required to surrender [their powers] by the superior sovereign, the United States." *Native American Church of North America v. Navajo Tribal Council,* 272 F.2d 131, 134 (10th Cir.1959). Thus federally recognized tribes hold certain powers and privileges allowed other sovereigns; jurisdiction over certain judicial matters and sovereign immunity are two such characteristics.

## Jurisdiction

■ Judicial jurisdiction over matters involving Indians or Indian tribes is a function both of territory—where the matters arise—and of subject matter—what the nature of the claim is. "A court's jurisdiction may depend not only on the location of events but also on the race of the parties or the subject matter of the case." Cohen, *Federal Indian Law, supra,* at 281. Given the pervasive sweep of federal law in Indian matters and the deference to Indian sovereignty within that law, jurisdiction of state courts over both civil and criminal matters involving Indians is governed by federal statute or case law. In *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832), the U.S. Supreme Court held that, absent federal action, Indian tribes are not subject to the jurisdiction asserted over them by a state. The Court reaffirmed this holding over 100 years later in *Bryan v. Itasca County Minnesota,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112–13, 48 L.Ed.2d 710 (1976) (quoting

*Oklahoma Tax Commission v. United States,* 319 U.S. 598, 613–14, 63 S.Ct. 1284, 1291, 87 L.Ed. 1612 (1943) (Murphy, J., dissenting)), when it said: "Indians stand in a special relation to the federal government from which the states are excluded unless the Congress has manifested a clear purpose to terminate * * * immunity and allow states to treat Indians as part of the general community." Thus, absent a grant of federal authority, state courts have no jurisdiction over Indians, Indian tribes or other Indian entities. *See, e.g., National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 855–56, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985); *Fisher v. District Court of the Sixteenth Judicial Dist. of Montana,* 424 U.S. 382, 387, 96 S.Ct. 943, 946–47, 47 L.Ed.2d 106 (1976); *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251 (1959); *United States v. Kagama,* 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886).

■ In some states, including Minnesota, Congress has provided for state court criminal jurisdiction for matters occurring within Indian country, 18 U.S.C. § 1162 (1994), and for civil jurisdiction in actions to which Indians are parties. 28 U.S.C. § 1360 (1994). However, the reach of congressionally authorized state court jurisdiction provided in so-called Public Law 280[4] states does not extend to tribes or tribal entities. *See Bryan,* 426 U.S. at 389, 96 S.Ct. at 2111.

Jurisdiction over federally recognized tribes themselves, or tribal entities, is governed by federal case law. The U.S. Supreme Court has determined that state court jurisdiction over tribal activities that took place within Indian country would undermine the congressional aim of encouraging self-government and self-determination by the dependent tribes and "infringe on the right of the Indians to govern themselves." *Williams,* 358 U.S. at 223, 79 S.Ct. at 272.

---

4. Public Law 280, now codified as 28 U.S.C. § 1360 (1994), identified six original states whose state courts would have jurisdiction over "civil causes of action between Indians or to which Indians are parties which arise in * * * Indian country * * *." This law was later modified by the law now codified as 25 U.S.C. § 1322

(1994) to give state courts jurisdiction over civil matters in Indian country "with the consent of the tribe." However, the original six states (Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin) all retained original civil jurisdiction even without the consent of the tribes.

However, the Court found no such infringement where the tribal activities took place off the reservation. Specifically, the Court has said "[a]bsent express federal law to the contrary, [Indian business entities] going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). In those circumstances, the Court has held that state courts may have jurisdiction to hear the cause of action.

■ This case is, of course, complicated by the fact that some of the alleged tortious acts took place within Indian country, while others did not. Since controlling federal common law turns largely on the location of the alleged tortious activity, it provides no clear guidance as to which court system may assert jurisdiction. Because this case involves non-Indian individuals and Indian tribal business entities and because it involves acts occurring both within Indian country and outside, it may be one of those cases where "'both the tribe and the State could fairly claim an interest in asserting [our] respective jurisdictions.'" *Duluth Lumber and Plywood Co. v. Delta Development*, 281 N.W.2d 377, 382 n. 3 (Minn.1979) (quoting *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 179, 93 S.Ct. 1257, 1266, 36 L.Ed.2d 129 (1973)).

■ Thus, in some respects, this jurisdictional puzzle is best considered as an issue of concurrent jurisdiction. Concurrent jurisdiction describes a situation where two or more tribunals are authorized to hear and dispose of a matter and the choice of which tribunal is up to the person bringing the matter to court. *Black's Law Dictionary* 291 (6th ed. 1990). Such a jurisdictional overlap is common between the federal and state courts as both courts are empowered to hear certain claims, such as those arising under 42 U.S.C. § 1983 (1994), *Allen v. McCurry*, 449 U.S. 90, 99–100, 101 S.Ct. 411, 417–18, 66 L.Ed.2d 308 (1980), or the Consumer Product Safety Act, 15 U.S.C. §§ 2051–2084 (1994), *Swenson v. Emerson Elec. Co.*, 374 N.W.2d 690, 697 (Minn.1985), *cert. denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). Concurrent jurisdiction conflicts are not limited to the courts of two sovereigns. Indeed, this court has held that the various district courts across the state operate as independent tribunals and, thus, have concurrent jurisdiction. *State ex rel. Minnesota Nat. Bank of Duluth v. District Court, Fourth Judicial District, et al.*, 195 Minn. 169, 173, 262 N.W. 155, 157 (1935).

■ When a concurrent jurisdiction problem arises, the proceedings of one court will usually be stayed or dismissed, often through the use of the abstention doctrine. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 806, 96 S.Ct. 1236, 1240–41, 47 L.Ed.2d 483, *reh'g denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). Abstention is a "narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813, 96 S.Ct. at 1244. It is appropriate only in limited circumstances, when continuing federal proceedings would be improper or moot, given the anticipated outcome of state proceedings. *Id.* at 814–16, 96 S.Ct. at 1244–46. Generally, however, comity between courts will resolve instances "[w]here two actions between the same parties, on the same subject, and to test the same rights, are brought in different courts having concurrent jurisdiction, the court which first acquires jurisdiction * * * may dispose of the whole controversy * * *." *Minnesota National Bank of Duluth*, 195 Minn. at 173, 262 N.W. at 157. Although, unlike some concurrent jurisdiction cases, there are not two competing lawsuits here—one in tribal court and one in state court—we think that concept provides a useful framework for discussion.

In this matter, we find no federal prohibition on state court consideration of civil claims arising out of the acts of Indian business entities occurring outside of Indian country. Further, we believe Gavle would ordinarily be expected to try all her claims in one judicial proceeding; that is, it would be highly inappropriate to allow her to proceed against LSI in two judicial fora, with some allegations of tortious conduct arising within Indian country to be considered in tribal court and those arising outside to be considered in state court. Thus, we conclude that

state courts have jurisdiction of Gavle's claims, including those arising within Indian country (although, of course, tribal courts, may have jurisdiction, as well).[5]

■ However, as in cases involving concurrent jurisdiction, instances of jurisdictional disputes between tribal and state courts also raise the question of whether that jurisdiction should be exercised. The abstention doctrine and the "first to file" rule are not truly rules at all, but principles, a "blend of courtesy and expediency." *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946, 955 (D.Minn.1981), *aff'd,* 664 F.2d 660 (8th Cir.1981). These "principles" "should be applied in a manner serving sound judicial administration." *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121· (8th Cir.1985). In Indian law matters, the related concept is identified as "infringement," which brings us to our next issue.

## Infringement

As LSI notes, the governing federal principle in determining whether a court should exercise concurrent jurisdiction of the kind present here is one of deference. *See, e.g., McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 175, 93 S.Ct. 1257, 1263–64, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *Duluth Lumber and Plywood Co. v. Delta Development,* 281 N.W.2d 377, 382 (Minn.1979). The doctrine at work is referred to both as "infringement" and as "preemption."

The Supreme Court views preemption as an additional means of protecting Indian sovereignty. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583–84, 65 L.Ed.2d 665 (1980). The Court held that preemption "is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state * * * and tribal interests at stake * * * to determine whether * * * the exercise of state authority would violate federal law." *Id.* at 145, 100 S.Ct. at 2584. Further, the Supreme Court, in *Williams v. Lee,* held that the general rule is that the exercise of state court jurisdiction must not "undermine the authority of the tribal courts over Reservation affairs" nor "infringe on the right of Indians to govern themselves." 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959). The Iowa Supreme Court, considering à similar question, said "[i]f the state interest is greater and does not encroach on Native American interests, the state may act." *Meier v. Sac and Fox Indian Tribe of the Mississippi in Iowa,* 476 N.W.2d 61, 64 (Iowa 1991).

The Court expanded upon this principle in two cases, *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* and *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). *LaPlante* involved the question of whether a federal court should "stay its hand" in order to allow a tribal court a "full opportunity to determine its own jurisdiction." *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 976 (quoting *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454). In *National Farmers Union,* the Court held that exhaustion of tribal court remedies allowed the tribal court the opportunity to explain why it took jurisdiction and allowed other courts the opportunity to benefit from the tribal court's "expertise in such matters * * *." *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454. The *LaPlante* court held that no state court jurisdiction could "interfere with tribal sovereignty and self-government" of a tribe as a "matter of federal law." *LaPlante,* 480 U.S. at 15, 107 S.Ct. at 976. However, the Court went on to state that "[e]xhaustion is required as a matter of comity, not as a juris-

---

5. The Supreme Court has repeatedly recognized that tribal courts have inherent power to exercise civil jurisdiction over non-Indians in disputes affecting the interests of Indians which are based upon events occurring in Indian country. *Montana v. United States,* 450 U.S. 544, 566, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493, *reh'g denied,* 452 U.S. 911, 101 S.Ct. 3042, 69 L.Ed.2d 414 (1981). We note further that the Judicial Court of the Shakopee Mdewakanton Sioux Community has previously ruled that LSI enjoys the same sovereign immunity as the tribe itself. *See, e.g., Culver Security Systems v. Little Six, Inc.,* Court File No. 026–92, slip op. at 3–4 (Shakopee Mdewakanton Sioux (Dakota) Tribal Court June 14, 1995).

dictional prerequisite." *Id.* at 16 n. 8, 107 S.Ct. at 976 n. 8.

The Supreme Court's reasoning in many of the infringement cases turns upon the vital role that tribal courts play in tribal self-government, especially where the question to be considered is, in the first instance, the jurisdictional limits of the tribal courts themselves. *See New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 332–33, 103 S.Ct. 2378, 2385–86, 76 L.Ed.2d 611 (1983); *United States v. Wheeler,* 435 U.S. 313, 332, 98 S.Ct. 1079, 1090–91, 55 L.Ed.2d 303 (1978). However, the infringement doctrine has also been considered in contexts other than questions of the tribal court's jurisdiction. For example, the question of the validity of certain claims alleged to arise under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 (1994), has been held to require exhaustion of tribal court remedies before a federal district court will take jurisdiction. *Prescott v. Little Six, Inc.,* 897 F.Supp. 1217, 1224 (D.Minn.1995); *see also Reservation Telephone Cooperative v. Three Affiliated Tribes of Fort Berthold Reservation,* 76 F.3d 181 (8th Cir.1996) (validity of tribal taxation of telephone lines and rights-of-way); *Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531 (10th Cir. 1995), *reh'g denied* (May 23, 1995) (validity of tribal taxation of coal mining "source gains").

▪ It should also be noted that the application of the infringement doctrine occurs largely in federal court. There are few instances of a state court deferring to the jurisdiction of a tribal court, where they shared concurrent jurisdiction. Further, we have found few cases in which a state court has been asked to require exhaustion of tribal court remedies when the underlying question to be resolved is whether a tribal business entity may assert the tribe's sovereign immunity. *See, e.g., Padilla v. Pueblo of Acoma,* 107 N.M. 174, 754 P.2d 845 (1988), *cert. denied, Pueblo of Acoma v. Padilla,* 490 U.S. 1029, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989); *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community,* 138 Ariz. 378, 674 P.2d 1376 (Ariz.Ct.App.1983); *White Mountain Apache Indian Tribe v. Shelley,* 107 Ariz. 4, 480 P.2d 654 (1971). The opin-

ions in these cases do not address the question of the jurisdiction of the state court to decide the sovereign immunity issue because jurisdiction was, apparently, assumed to exist. Therefore, we are left without controlling precedent or even persuasive case law on the issue of whether a state must defer to the tribal court on the question of whether a tribal business entity may assert the defense of sovereign immunity.

Although the question is a close one, we conclude that the consideration by Minnesota state courts of whether LSI may assert the defense of sovereign immunity does not "undermine the authority of the tribal courts" nor "infringe on the ability of Indian tribes to govern themselves." *Williams,* 358 U.S. at 223, 79 S.Ct. at 272. Minnesota state courts have a strong interest in determining for our citizens the nature of the legal claims that they may assert against tribal business entities and the defenses that may be raised in response. *See Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 366, 225 N.W.2d 238, 243 (1974). Furthermore, contrary to LSI's assertions, we do not seek to change the tribal laws, to reduce the community's ability to govern itself, or to remove the tribal court's jurisdictional claims to actions involving on-reservation activities. Instead, we choose to take jurisdiction only to establish Minnesota law on the issue of sovereign immunity for tribal business entities, in the hope that in so doing, we may avoid future disputes and pave the way to better understanding between the judicial systems.

### Sovereign Immunity

▪ Because we have jurisdiction to hear Gavle's claim, and we choose to exercise it, we now address the issue of sovereign immunity. It is settled law that tribes have the privilege of sovereign immunity, granted to them by Congress and existing at the sufferance of Congress. *Rice v. Rehner,* 463 U.S. 713, 719, 103 S.Ct. 3291, 3295–96, 77 L.Ed.2d 961 (1983). "Indian tribes enjoy immunity because they are sovereigns predating the Constitution, and because immunity is thought necessary to promote federal policies of tribal self-determination, economic development, and cultural autonomy." *American Indian Agricultural Credit Consortium,*

*Inc., v. Standing Rock Sioux Tribe,* 780 F.2d 1374, 1378 (8th Cir.1985) (citations omitted). Sovereign immunity has been successfully asserted as an affirmative defense to suit in federal or state court by tribes and their officers acting within the scope of their authority, and by some tribal entities. *See, e.g., United States v. Kagama,* 118 U.S. 375, 383–84, 6 S.Ct. 1109, 1113–14, 30 L.Ed. 228 (1886); *Weeks Construction, Inc. v. Oglala Sioux Housing Authority,* 797 F.2d 668, 671 (8th Cir.1986); *Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1321 (9th Cir.1983), *cert denied,* 467 U.S. 1214, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984).

The question before us today is whether LSI is the kind of tribal entity, analogous to a governmental agency, which should benefit from the defense of sovereign immunity, or whether it is more like a commercial business enterprise, instituted solely for the purpose of generating profits for its private owners. Gavle argues that LSI is a mere commercial activity, a corporation organized to generate profits, which happens to have its principal place of business on the reservation and whose owners happen to be Indians. Relying on the Arizona state supreme court decision in *Dixon v. Picopa Constr. Co.,* 160 Ariz. 251, 772 P.2d 1104 (1989), she contends that LSI serves no function akin to that of tribal government and thus cannot benefit from the sovereign immunity possessed by the tribe. Referring to its earlier case of, *White Mountain Apache Indian Tribe v. Shelley,* 107 Ariz. 4, 480 P.2d 654 (1971), which extended sovereign immunity to a tribal owned business entity, the *Dixon* court held that Picopa Construction Co., a tribal-owned corporation, was not a "subordinate economic organization" and thus did not have sovereign immunity. *Dixon,* 160 Ariz. at 258, 772 P.2d at 1111.

LSI, in turn, argues that the corporation was organized under the tribal ordinances and empowered with the same rights and privileges as the tribe. LSI points to a number of cases in which courts have extended the reach of a tribe's sovereign immunity to entities that were, in some way, subordinate organizations of the tribe. The Eighth Circuit has, for example, held that immunity existed for a tribal-chartered housing authority. *Weeks Construction,* 797 F.2d at 671; *Namekagon Development Co., Inc. v. Bois Forte Reservation Housing Auth.,* 395 F.Supp. 23, 28 (D.Minn.1974), *aff'd,* 517 F.2d 508 (8th Cir.1975). The New York Court of Appeals recently found sovereign immunity extended to a non-profit, state-chartered corporation. *In re Ransom v. St. Regis Mohawk Education & Community Fund, Inc.,* 86 N.Y.2d 553, 560, 658 N.E.2d 989, 993, 635 N.Y.S.2d 116, 120 (1995). Finally, the Seventh Circuit Court of Appeals has held that a contract with a wholly-owned tribal corporation, whose manufacturing facility was located within the boundaries of a reservation, was to be treated as a contract with the tribe itself. *Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 809–10 (7th Cir.1993), *cert. denied, Sioux Mfg. Corp. v. Altheimer & Gray,* 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993).

The connection between a tribal housing agency or social service agency and its "parent" tribe is relatively clear. But, the demarcation between those business entities so closely related to tribal governmental interests as to benefit from the tribe's sovereign immunity and those so far removed as to be treated as mere commercial enterprises is not as clear. As noted in a recent federal circuit court opinion, "whether tribal sovereign immunity now extends to commercial activities is an important, complex and unresolved question," which the U.S. Supreme Court has never directly considered. *In re Greene,* 980 F.2d 590, 600–01 (9th Cir.1992), *cert. denied, Richardson v. Mt. Adams Furniture,* 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994) (Rymer, J., concurring). It may be, as a federal district court in Wisconsin determined in a case with facts closely analogous to the instant case that " 'an action against a tribal enterprise is, in essence, an action against the tribe itself.' " *Barker v. Menominee Nation Casino,* 897 F.Supp. 389, 393 (E.D.Wis.1995) (quoting *Local IV–302 Int'l Woodworkers Union of Am. v. Menominee Tribal Enter.,* 595 F.Supp. 859, 862 (E.D.Wis.1984)). In *Barker,* a tribal gaming commission and casino were found to be immune from suit. 897 F.Supp. at 393. To aid our analysis, we turn to the criteria

that courts other than the U.S. Supreme Court have developed in examining similar fact patterns.

In *Shelley*, the Arizona Supreme Court, in addition to examining the closeness of the connection between the tribe and the business entity, looked to the intended purpose of the business entity. *Shelley*, 107 Ariz. at 7, 480 P.2d at 657. Applying this standard in the *Dixon* case, the Arizona court rejected the Picopa Construction Co.'s request for sovereign immunity partly because the business entity at issue was formed "solely for business purposes and without any declared objective of promoting the * * * general tribal or economic development * * *." *Dixon*, 160 Ariz. at 257, 772 P.2d at 1110. Thus, the *announced purpose* for which the business entity was formed is a strong factor in determining whether it may benefit from the tribe's sovereign immunity.

In addition to considering the general purpose for which the business entity was formed, the *Dixon* court also identified the following questions as important factors to determine the extension of sovereign immunity.

1) Was the business entity formed to manage or exploit specific tribal resources?

2) Would the federal policy designed to protect Indian assets and tribal cultural autonomy be furthered by extension of sovereign immunity to the business entity?

*Dixon*, 160 Ariz. at 257–58, 772 P.2d at 1110–11.

A more detailed approach was recently adopted by the New York Court of Appeals. The court outlined six factors to be considered in determining whether a tribal business entity should be extended the protection of sovereign immunity enjoyed by the tribe itself:

1) whether the entity is organized under the tribe's laws or constitution rather than federal law;

2) whether the organization's purposes are similar to or serve those of the tribal government;

3) whether the organization's governing body is comprised mainly of tribal officials;

4) whether the tribe has legal title or ownership of property used by the organization;

5) whether tribal officials exercise control over the administration or accounting activities of the organization; and

6) whether the tribe's governing body has power to dismiss members of the organization's governing body.

*In re Ransom*, 86 N.Y.2d at 559, 658 N.E.2d at 992, 635 N.Y.S.2d at 119.

Taking into account the reasoning of these cases, we conclude that the principal factors to be considered in determining whether tribal sovereign immunity extends to a tribal business entity are three:

1) whether the business entity is organized for a purpose that is governmental in nature, rather than commercial;

2) whether the tribe and the business entity are closely linked in governing structure and other characteristics; and

3) whether federal policies intended to promote Indian tribal autonomy are furthered by the extension of immunity to the business entity.

Applying these factors to the facts at hand, we conclude that, as a tribal business entity, organized for the general benefit of the Community and closely linked to the governing structure of the Community, LSI is entitled to sovereign immunity from civil action in state court.

First, we note that LSI was created for the specific purpose of "improv[ing] the business, financial or general welfare of the Corporation, the Members of the Corporation, and the Community." Articles of Incorporation, *supra*, at § 3.0. While Gavle may argue that LSI's economic activity serves no governmental purpose, the U.S. Supreme Court, in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), relied upon the Bureau of Indian Affairs' view that "tribal bingo enterprises are an appropriate means by which tribes can further their economic self-sufficiency, the economic development of reservations and tribal self-determination." *Id.* at 217–18 n. 21, 107 S.Ct. at 1092–93 n. 21 (quoting an affidavit submitted to the court

by the Director of Indian Services for the Bureau of Indian Affairs). This seems to recognize the unique role that Indian gaming serves in the economic life of here-to-fore impoverished Indian communities across this country.

 As noted by the Fifth Circuit Court of Appeals, "[t]he fact that the [tribe] was engaged in an enterprise private or commercial in character, rather than governmental, is not material [to the availability of sovereign immunity]. It is in such enterprises and transactions that the Indian tribes and the Indians need protection." *Maryland Cas. Co. v. Citizens Nat. Bank of West Hollywood*, 361 F.2d 517, 521 (5th Cir.), *cert. denied, Maryland Cas. Co. v. Seminole Tribe of Florida, Inc.*, 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966).

Further, LSI is owned wholly by the Community, as a governmental unit, unlike business enterprises organized under the corporate laws of Minnesota, the ownership of which is typically vested in private citizens, for their personal benefit. LSI's Board of Directors must include at least three members of the Community Business Council and a majority of the Board of Directors must be members of the Community. Articles of Incorporation, *supra*, at §§ 7.3 and 7.41 Also, directors may be removed from office in a proceeding commenced by 10% of the corporation (who are all of the members of the Community) in the Mdewakanton Sioux Community Court. *Id.* at § 7.152. There is, therefore, a close link between the Community and the management of LSI.[6]

We also note that federal statutory law supports the notion that gaming activity is closely linked to the well-being of the tribe. All Indian gaming is conducted pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721 (1994). Under the provisions of IGRA, only tribal entities can engage in Indian gaming and gaming by Indian tribes is recognized as a "means of promoting tribal economic development, self-sufficiency and strong tribal governments."

25 U.S.C. § 2702 (1994). Thus, as a matter of federal law, LSI must be a tribal entity in order to conduct gaming authorized by the statute. A mere commercial activity, incorporated by Indian individuals for the ostensible purpose of conducting gaming in Indian country, would be prohibited from doing so under federal law. This seems to us a strong recognition of the close link between the tribe itself and LSI, the gaming business entity, and also of the federal policy encouraging tribal economic well-being through the operation of such gaming businesses.

The dissent seems to be influenced by the fact that LSI is a "for-profit, multi-million dollar" enterprise and therefore contends that our analysis under each of these factors is mistaken. With regard to the first factor, the purpose for which the business entity is organized, the dissent asserts that this factor would favor immunity for LSI if LSI were engaged in activity, such as providing housing or educational services, that directly benefited the tribe. This point ignores the force of *Cabazon*, which found that gaming activities could further tribal economic development and self-determination. *Cabazon*, 480 U.S. at 217–19, 107 S.Ct. at 1092–94. The dissent also argues that the tribe is not involved in the day-to-day management of LSI and, therefore, LSI is more a private corporation than an extension of the tribal government. However, control of a corporation need not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management. Lastly, the dissent asserts that granting sovereign immunity to LSI would be neutral, or possibly detrimental towards the federal goal of preserving tribal sovereignty and cultural heritage. We do not see how being successful in business and immune from suit necessarily undermines these goals. There is simply no way to avoid the fact that LSI is different from other corporations, regardless of how much money it makes—it is integrally related to the Shakopee Mdewakanton Sioux Community, a federally recognized Indian

6. We note also that an amended Community Corporation Ordinance and restated Articles of Incorporation of LSI, filed after the commencement of this litigation, provide an even closer

link between the members of the Community and the management of LSI. *See* Articles of Incorporation of Little Six, Inc. (amended, Feb. 28, 1995).

tribe, and is, therefore, different, despite surface similarities to other for-profit enterprises.

A further concern, if this court were to reject LSI's claim of sovereign immunity, is the intrusion by this court into matters of centuries old common law [7] and federal policy, without the slightest suggestion from Congress or the United States Supreme Court that sovereign immunity for tribal corporations is now to be abandoned. We are reminded of the importance of the plenary role of Congress in determining the scope and application of the sovereign immunity doctrine in *United States v. Wheeler* where the Supreme Court stated:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until. Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

Gavle's appeal here is not unlike that of the State of Oklahoma in *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). In relation to the collection of state tax on the sale of cigarettes to tribal members on tribal land, the state argued that "tribal business activities * * * are now so detached from traditional tribal interests that the tribal sovereignty doctrine no longer makes sense in this context," and that "no purpose is served by insulating tribal business ventures from the authority of the States to administer their laws." *Id.* at 510, 111 S.Ct. at 910. The Supreme Court rejected this argument, reaffirming again the unique role of Congress in determining circumstances where the doctrine of sovereign immunity should be modified:

> Congress has always been at liberty to dispense with such tribal immunity or to limit it. Although Congress has occasion-ally authorized limited classes of suits against Indian tribes, it has never authorized suits to enforce tax assessments. Instead, Congress has consistently reiterated its approval of the immunity doctrine * * *. These Acts reflect Congress' desire to promote the "goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development" * * *. Under these circumstances, we are not disposed to modify the long-established principle of tribal sovereign immunity.

*Oklahoma Tax Comm'n,* 498 U.S. at 510, 111 S.Ct. at 910 (citations omitted). While the time may well come, or even be upon us now, that a tribal owned corporation, operated for profit as is LSI, should as a matter of fairness and equity be subject to the same liabilities as a non-tribally owned corporation, it is not for this court to make that decision in the absence of some change in Congressional policy or direction from the U.S. Supreme Court indicating that under such circumstances elimination of the tribal corporation's sovereign immunity is appropriate.

Thus, we conclude that as a tribal business entity, formed to enhance the well-being of the Community and closely linked to it in governance, LSI has sovereign immunity from suit, unless it has waived that immunity by express and unequivocal action. We address the issue of waiver next.

### Waiver

 We begin with the basic tenet of Indian law that tribal sovereign immunity may be waived, but such a waiver must be express and unequivocal and may not be implied. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106 (1978). Gavle here argues that the Articles of Incorporation allow LSI to waive any immunity from suit, relying upon the language of section 3.2 providing that

> The Corporation shall have the power to sue and is authorized to consent to be sued in the Judicial Court of the Shakopee Mde-

**7.** See *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812).

wakanton Sioux Community or another court of competent jurisdiction;

However,

to be effective, the Corporation must, by action of the Board of Directors, explicitly consent to be sued in a contract or other commercial document in which the Corporation shall also specify the terms and conditions of such consent.

Articles of Incorporation, *supra*, at § 3.2.

Based on these provisions it is clear that LSI was legally authorized to waive its sovereign immunity defense by "explicit consent," contained in a "contract or other commercial document" and "specifying the terms and conditions of such consent."

Gavle next asserts that these three requirements are met through LSI's registration with the Secretary of State as a foreign corporation, pursuant to Minn.Stat. § 303.01–.25 (1994). LSI's application to do business in Minnesota provides that the corporation irrevocably consents to service of process, as provided by Minn.Stat. § 303.13 (1994), and was signed by Allene Ross, vice-chair of LSI.

Thus, the issue before us is whether such a corporate registration and consent to service is the kind of "express and unequivocal" waiver of sovereign immunity that is called for under the Articles of Incorporation and that *Santa Clara Pueblo* and its progeny require. Like the court of appeals, we conclude that it is not. Quite simply, consent to service of process, and thus to personal jurisdiction, cannot be construed as an automatic waiver of an otherwise available affirmative defense. Presumably foreign corporations that register to do business in Minnesota do not understand that they are waiving their right to assert affirmative defenses, based, for example upon a statute of limitations, failure of consideration, accord and satisfaction and the like. *See* Minn. R. Civ. P. 8.03 (1996). Similarly, we conclude that LSI, by agreeing to service of process, cannot be said to have waived the affirmative defense of sovereign immunity.

This conclusion is fully in accord with controlling federal case law. While it is true, as Gavle argues, that no "magic words" are necessary to operate as a waiver of sovereign immunity, *Rosebud Sioux Tribe v. Val–U Const. Co. of South Dakota, Inc.*, 50 F.3d 560, 563 (8th Cir.), *reh'g denied* (Apr. 21, 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 78, 133 L.Ed.2d 37 (1995), there are simply no words here, magic or otherwise, that articulate the kind of clear abandonment of this powerful affirmative defense mandated by the Supreme Court. That kind of particularity is found, by contrast, in a tribal council resolution expressly waiving sovereign immunity. *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 540 (10th Cir.1980), *aff'd*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

Furthermore, the New York Court of Appeals, in the face of an even more explicit state statutory provision, has recently held that the St. Regis Mohawk tribe did not waive its sovereign immunity merely by qualifying to do business as a foreign corporation in the state of New York.

[T]he mere fact that a tribal corporation, by statute, has designated an agent for service of process or is empowered to "sue and be sued" does not automatically subject that corporate entity to any court's jurisdiction where jurisdiction is otherwise lacking. * * * [E]xpress invocation of the power to sue and be sued and submission to a particular forum by official tribal action is required.

*Ransom,* 86 N.Y.2d at 563, 658 N.E.2d at 995, 635 N.Y.S.2d at 122. We agree with this analysis.

Gavle also argues from cases which find the needed specificity in "sue and be sued clauses" contained in tribal contracts or other business documents. *See, e.g., Fontenelle v. Omaha Tribe of Neb.*, 430 F.2d 143, 147 (8th Cir.1970). If there were such a provision at issue here, our conclusion might indeed be different. LSI's articles of incorporation do indeed allow for a "consent to be sued," but they require that it be "explicit" and detailed as to "terms and conditions of the consent." We have no "sue or be sued" clause before us nor anything that specifies "terms and conditions of consent" and thus, there is no waiver of immunity based on this provision of the charter.

Finally, we also find inapposite Gavle's reliance on cases standing for the proposition that a foreign corporation that appoints an agent for service under Minn. Stat. § 303.13 necessarily consents to be sued. *See, e.g., Bowles v. L.D. Schreiber & Co.,* 56 F.Supp. 814, 815 (D.Minn.1944) (citing *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167 (1939)); *Rykoff–Sexton, Inc. v. American Appraisal Associates, Inc.,* 469 N.W.2d 88, 90 (Minn.1991). It is enough to note that none of these cases dealt with the issue of a waiver of Indian tribal immunity, for which, as noted above, the Supreme Court has identified specific requirements. Further, at most, they represent the proposition that appointment of an agent may serve as a concession on the issue of personal jurisdiction.

The Supreme Court's holding in *Santa Clara Pueblo* created a high threshold on the issue of a tribe's waiver of its sovereign immunity and manifested strong public policy protective of tribal independence. We cannot conclude that a mere agreement to accept service of process rises to meet that threshold, and therefore, we hold that LSI did not waive its immunity from suit.

We note for the record that the dissent and other state judicial brethren have expressed displeasure that we find that sovereign immunity may extend to a tribal business entity. However, we find no statute or congressional mandate that denies Indian tribes their sovereign status. As recently as 1991, the Supreme Court noted that "[a] doctrine of Indian sovereign immunity was originally enunciated by this Court and has been reaffirmed in a number of cases. Congress has always been at liberty to dispense with such tribal immunity or limit it. * * * Instead, Congress has consistently reiterated its approval of the immunity doctrine." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma,* 498 U.S. 505, 510, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991) (citations omitted).

So, too, do we reiterate and reaffirm that doctrine by our holding today.

Affirmed.

KEITH, C.J., and COYNE, J., dissenting.

KEITH, Chief Justice, dissenting in part.

I respectfully dissent. While I agree with the majority that state courts have concurrent jurisdiction with tribal courts in lawsuits of this type, I disagree with the majority's conclusion that for-profit, multi-million dollar private tribal businesses like Little Six, Inc. (LSI) may rely upon the same sovereign immunity defense to which the tribe itself is entitled. As the majority frames the issue, the question is whether LSI is a tribal entity "analogous to a governmental agency" which should benefit from the sovereign immunity defense, or whether LSI is in fact a "commercial business enterprise, instituted solely for the purpose of generating profits for its private owner." It seems to me that LSI clearly fits the latter definition. Accordingly, I would reverse the decision of the court of appeals and permit Gavle to pursue her various claims against LSI in state court.

The result of the majority's decision in this case is to grant total immunity from suit to a complex, for-profit corporate entity with hundreds of employees which transacts business both inside and outside Indian country. By extending the sovereign immunity defense to include LSI, the majority ignores the historical purpose of the sovereign immunity doctrine in this country as applied to Indian tribes, which is to grant special independent sovereign status to Indian tribes and their *governmental* bodies. In no way does LSI conform to the ordinary conception of a nonprofit, governmental entity entrusted with promoting the welfare of its citizens: clearly, LSI is first and foremost a *corporation* engaged in a for-profit business venture for the purely financial benefit of its shareholders.

The majority cites several factors which other courts have relied upon to answer the "important, complex and unresolved question" of whether tribal sovereign immunity protects commercial activities. Selecting just three of these factors, the majority then reaches the conclusion that LSI is entitled to sovereign immunity in this case. I disagree. First, the majority cites LSI's own Articles of Incorporation as "evidence" of LSI's intended purpose of "improving the business,

financial or general welfare of the Corporation, Members of the Corporation, and the Community." This language, however, could be found in the articles of incorporation of any for-profit corporation and certainly does not suggest that LSI was intended to benefit the Community in the same sense as a housing authority, educational fund, agricultural cooperative or other extension of the tribal government intended solely to promote the tribe's well-being. Instead, it is clear from the trial court record that LSI's primary purpose is to generate profits for its shareholders (*i.e.*, the tribe's members) without any restrictions whatsoever on the use of the funds from the casino. I do not mean to suggest that generating profits for the tribe's members is an improper or unethical objective, but merely point out that a corporation like LSI should not receive the same protections as tribal businesses whose funds are directed towards general improvements for the community as a whole, such as education, environmental protection, health care or job opportunities.[1]

Second, the majority is persuaded by the fact that LSI's single share of stock is owned by the Community as a whole, and that its Board of Directors must include a majority of Community members. However, this does not change the fact that LSI is a private corporation, registered to transact business in the State of Minnesota like any other private business, and certainly not an extension of the tribal government per se. Furthermore, LSI was not incorporated under Section 17 of the Indian Reorganization Act, which extends sovereign immunity to corporations formed by tribal governments to further the tribe's economic interests. *See* 25 U.S.C. §§ 476, 477 (1994). The tribal government is not involved in the day-to-day operations of LSI's business ventures, does not select or supervise the board of directors,

nor is tribal property threatened by judgments against the corporation. As the court of appeals found, LSI "was created as a separate economic entity, not subject to governmental control, incorporated under tribal law and not merely as an authorized tribal activity." *Gavle v. Little Six, Inc.*, 534 N.W.2d 280, 284 (Minn.App.1995).

And finally, the majority claims that extending sovereign immunity to LSI will follow federal policy encouraging the tribe's autonomy and general welfare. However, denying sovereign immunity to LSI, a corporation whose primary responsibilities consist of running a casino, would not infringe upon the federal government's laudable goals of cultural preservation, conservation of natural resources owned by the tribe, or promotion of tribal self-government. The assets of the Community would not be jeopardized by court judgments against LSI, and in fact there is a persuasive argument that extending sovereign immunity to corporations like LSI could be potentially detrimental to the tribe's business interests. As the Arizona Supreme Court noted in *Dixon v. Picopa Construction Co.*, 160 Ariz. 251, 259, 772 P.2d 1104, 1112 (Ariz.1989), "an Indian corporation's successful assertion of immunity, even in a negligence case, may deter persons or entities from entering into contractual relationships with that Indian corporation or any other Indian corporation. Non–Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit."

I find substantial similarities between the facts at issue in this case and those considered by the Arizona court in *Dixon.* In that case, the court held that a construction company incorporated by an Indian tribe was not a "subordinate economic organization," and therefore was not entitled to assert the tribe's sovereign immunity defense in a tort

---

**1.** *See, e.g., Ransom v. St. Regis Mohawk Educ. & Community Fund, Inc.*, 86 N.Y.2d 553, 658 N.E.2d 989, 635 N.Y.S.2d 116 (N.Y.1995) (nonprofit tribal corporation organized to provide education and health services to tribe enjoyed tribe's sovereign immunity); *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (Ariz.1971) (tribal agency empowered with management of tribe's timber resources was "subordinate economic organization" and there-

fore was immune from suit); *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community*, 138 Ariz. 378, 674 P.2d 1376 (Ariz.Ct.App.1983) (agricultural venture created to promote economic welfare of Indian community and whose property was entirely owned by community was "subordinate economic organization" of tribal government and therefore entitled to tribal sovereign immunity).

action brought by an automobile driver following an off-reservation automobile accident. *Id.*, 160 Ariz. at 255–57, 772 P.2d at 1108–10 (citing *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (Ariz.1971)). Like LSI, the Picopa Construction Company involved in the *Dixon* case had a board of directors separate from the tribal government and with exclusive administrative control of the corporation's day-to-day operations, was instituted as a for-profit business venture with the Community as the sole shareholder, was not organized under Section 17 of the Indian Reorganization Act, and was not intended to carry out the Community's governmental functions. *Id.* at 254–58, 772 P.2d at 1107–11. I would follow the Arizona court's reasoning in *Dixon* and *Shelley*, and require that a business incorporated under tribal law show itself to be an extension of the tribal government in order to take advantage of the tribe's sovereign immunity defense. In this case, it is clear that LSI does not meet this test. In conclusion, I believe that Gavle should be permitted to pursue her claims against LSI in state court because LSI is not an economic organization subordinate to the tribal government.

COYNE, Justice, dissenting.

I dissent. Little Six, Inc., applied for and was granted a certificate of authority to transact business in Minnesota as a foreign corporation in accordance with Chapter 303 of Minnesota Statutes. For more than 50 years before the incorporation of Little Six, Inc., Minnesota has accorded registered foreign corporations the following powers:

> After the issuance of a certificate of authority by the secretary of state and until cancellation or revocation thereof or issuance of a certificate of withdrawal, the corporation shall possess within this state the same rights and privileges that a domestic corporation would possess if organized for the purposes set forth in the articles of incorporation of such foreign corporation pursuant to which its certificate of authority is issued, *and shall be subject to the laws of this state.*

Minn.Stat. § 303.09 (1994) (emphasis added). Gavle complains of violation of the Minnesota Human Rights Act, Minn.Stat. ch. 363 (1994). The requirements of the Minnesota Human Rights Act are applicable to the state and its political subdivisions as well as to private employers, and I can see no earthly reason for permitting a foreign corporation to depart the Shakopee Mdewakanton Sioux (Dakota) reservation and to violate with impunity the human rights of Minnesota citizens while transacting business in Minnesota.

That Indian tribes retain a unique sovereignty is beyond dispute. When the members of the tribe reside on the reservation and confine their commercial activities to the reservation, the State of Minnesota may not and does not subject the tribe's members to the state's tax laws. *Brun v. Commissioner of Revenue*, 549 N.W.2d 91 (Minn.1996). When, however, the sovereign becomes a merchant, his license to carry on his commercial activity on foreign soil and to carry on his trade with the inhabitants of the foreign state is expressly subject to the laws of the licensor. Little Six, Inc., like any other foreign corporation, must be deemed to have accepted the certificate of authority to transact business in Minnesota subject to its express limitations.

As Chief Justice John Marshall put it in 1812, although the "military force which supports the sovereign power and maintains the dignity and independence of a nation" is not subject to the jurisdiction of another sovereign nation whose borders the military force crosses under license to do so, "[a] prince, by acquiring private property in a foreign country, * * * may be considered as so far laying down the prince, and assuming the character of a private individual," that he subjects the property to the territorial jurisdiction. *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 145, 3 L.Ed. 287 (1812).

In modern parlance that statement means that if a commercial entity enters a commercial arena outside its own territory pursuant to a Minnesota certificate of authority to transact business as a foreign corporation, the foreign corporation is subject not merely to Minnesota's jurisdiction, but it is subject to the laws of Minnesota and the defense of

sovereign immunity is, at the very least, of no more avail to the foreign corporation than it is to the state and its political subdivisions.

Therefore, I would reverse the lower courts and remand for vacation of the summary judgment in favor of Little Six, Inc.