STATE OF MINNESOTA

IN SUPREME COURT

A14-0605

Court of Appeals                                                          Anderson, J.
                                            Dissenting, Lillehaug, J., Gildea, C.J.
                                            Took no part, Hudson, Chutich, JJ.

LaVonne Pfeil, Individually and as Trustee
for Heirs of Henry Pfeil, deceased,

                    Appellant,

vs.                                                            Filed:  April 6, 2016
                                                       Office of Appellate Courts
St. Matthews Evangelical Lutheran Church
of the Unaltered Augsburg Confession of
Worthington, Nobles County, Minnesota,
et al.,

                    Respondents.

_____

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota, for appellant.

Ken D. Schueler, Jennifer M. Peterson, Dunlap & Seeger, P.A., Rochester, Minnesota; and

Timothy J. O'Connor, William L. Davidson, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, Minnesota, for respondents.

Mark R. Bradford, Steven P. Aggergaard, Bassford Remele, Minneapolis, Minnesota; and

Sherri C. Strand, Mark Sableman, Anthony F. Blum, Thompson Coburn, LLP, Saint Louis, Missouri, for amicus curiae The Lutheran Church-Missouri Synod.

_____

1

SYLLABUS

Under the ecclesiastical abstention doctrine, pastors and their church are not liable to former parishioners for defamation or related common-law torts for statements made by the pastors during the course of formal church discipline proceedings when the statements were communicated only to other members of the church and participants in the formal church discipline process.

Affirmed.

OPINION

ANDERSON, Justice.

In this case, we are presented with the question of whether pastors and their church can be held liable for statements the pastors made about a parishioner during formal church disciplinary proceedings. Appellants LaVonne and Henry Pfeil allege that they were defamed by the pastoral staff of St. Matthew Lutheran Church[1] during two church disciplinary proceedings that were held for the purpose of excommunicating the Pfeils from St. Matthew. The district court dismissed the Pfeils' claims with prejudice on First Amendment grounds, and the court of appeals affirmed. Because the First Amendment to the United States Constitution protects the right of a religious

---

[1] There appears to be some discrepancy with respect to the church's proper name. Appellant indicates that, according to the Secretary of State's office, the church's legal name is "St. Matthews [sic] Evangelical Luthern [sic] Church of the Unaltered Augsburg Confession of Worthington, Nobles County, Minnesota." The church is commonly referred to as "St. Matthew" and respondents have clarified that the church would prefer to be identified as "St. Matthew."

2

organization to make autonomous decisions regarding church discipline and membership, we affirm the district court's dismissal of the claims.

I.

Prior to 2011, LaVonne and Henry Pfeil were longstanding members of St. Matthew.[2] St. Matthew, in turn, is a member of the Lutheran Church-Missouri Synod. On August 22, 2011, the Pfeils received a letter signed by St. Matthew's pastors, respondent Thomas Braun ("Braun") and respondent Joe Behnke ("Behnke"). The letter contained several allegations regarding the Pfeils' conduct over the preceding two years, but focused on complaints that the Pfeils had been engaged in "slander and gossip" against the leadership and ministry of the congregation. In addition to criticizing the Pfeils' behavior, the letter advised the Pfeils that they had excommunicated themselves from St. Matthew and informed the Pfeils that their church membership had been terminated.

Subsequent to the August 22 letter, the Lutheran Church-Missouri Synod advised the leadership of St. Matthew to hold a "special voters' meeting" so that the congregation could vote to affirm or reject the excommunication decision. The Pfeils and approximately 89 members of St. Matthew attended the special voters' meeting, which was held on September 25, 2011. Braun addressed the meeting, reading from a set of prepared remarks, and published the August 22 letter to those present at the meeting.

---

[2] Because this case was resolved on a Rule 12 motion to dismiss, the facts recited here are drawn from the Pfeils' Second Amended Complaint.

3

According to the Pfeils, Braun's remarks and the August 22 letter contained several defamatory statements, including:

- The Pfeils were actively involved in slander, gossip, and speaking against Braun and his wife, Behnke, and the St. Matthew Board of Elders.
- The Pfeils had intentionally attacked, questioned, and discredited the integrity of Braun, Behnke, and other St. Matthew church leaders.
- Other people had observed the Pfeils display anger and disrespect toward Braun.
- The Pfeils had publicly engaged in "sinful behavior" inside and outside St. Matthew.
- The Pfeils had engaged in behavior unbecoming of a Christian.
- The Pfeils had engaged in a "public display of sin."
- The Pfeils had refused to meet for the purpose of confession and forgiveness.
- The Pfeils had "refused to show respect" toward servants of God and St. Matthew church leadership.
- The Pfeils had led other people into sin.
- The Pfeils had engaged in slander and gossip and had refused to stop engaging in slander and gossip.
- The Pfeils had refused to follow the commands and teachings of God's word.

After Braun's remarks, ballots were distributed to the members of St. Matthew who were present at the meeting, and the members voted to affirm the pastors' decision to terminate the Pfeils' membership at St. Matthew. Subsequently, in March 2012, a Missouri Synod panel held a hearing to reconsider the Pfeils' excommunication. The Pfeils allege that during the Synod hearing, Behnke falsely claimed that the Pfeils had recently accused Behnke of stealing money from St. Matthew. The Synod panel also affirmed the Pfeils' excommunication.

On August 16, 2013, LaVonne Pfeil brought a lawsuit on behalf of herself and Henry Pfeil, asserting claims for defamation and negligence against St. Matthew, Braun,

4

and Behnke (collectively respondents).[3]   On December 24, 2013, respondents filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Minn. R. Civ. P. 12.02(c).   Respondents argued that the Pfeils' claims would cause the district court to become excessively entangled with religion and that the claims were therefore barred by the First Amendment to the United States Constitution under the "ecclesiastical abstention doctrine."

After resolving Henry Pfeil's claims on other grounds,[4] the district court concluded that the First Amendment deprived the court of jurisdiction to adjudicate LaVonne Pfeil's remaining claims and dismissed the case with prejudice.   The Pfeils appealed the district court's ruling and the court of appeals affirmed with respect to the First Amendment issue, concluding that the First Amendment barred all of the Pfeils'

---

[3]   Henry Pfeil died in April 2012.  After LaVonne Pfeil filed suit, the district court named her trustee for Henry Pfeil's claims, and the complaint was amended to reflect this change.  Although only LaVonne Pfeil appears here, we refer to the Pfeils collectively in this opinion for convenience.

[4]   Previously, respondents moved to dismiss for failure to state a claim under Minn. R. Civ. P. 12.02(e), arguing that the Pfeils did not plead the defamatory statements with sufficient detail and that Henry Pfeil's claims did not survive his death.  The Pfeils countered by opposing the motion, moving to amend their complaint, and submitting a second amended complaint for the district court's consideration.  The court granted the Pfeils' motion to amend their complaint; granted respondents' motion to dismiss with respect to Henry Pfeil's claims, finding that they did not survive his death; and denied respondents' motion with respect to LaVonne Pfeil's claims, finding that they were pleaded with sufficient detail.  None of these rulings are before us because they were not appealed or argued to this court and the court of appeals resolved the case solely on First Amendment grounds.

5

claims.[5] *Pfeil v. St. Matthews Evangelical Lutheran Church*, No. A14-0605, 2015 WL 134055, at *3-6 (Minn. App. Jan. 12, 2015). We granted review to clarify our jurisprudence regarding the intersection of the First Amendment and civil claims against religious institutions.

II.

A.

The district court and the court of appeals based their rulings on what they termed the "ecclesiastical abstention doctrine." The legal principle that has come to be known as the "ecclesiastical abstention doctrine" or the "church autonomy doctrine" has its roots in a line of U.S. Supreme Court decisions regarding church property and church schisms. The first, *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872), concerned a dispute over which individuals were entitled to the position of "elder" in a Presbyterian church in Kentucky. *Id.* at 714. Rather than evaluate the merits of the parties' arguments regarding church doctrine, the Court deferred to the ruling of the Presbyterian General Assembly, which did not recognize the individuals in question as elders, and indicated the lower courts should have exercised the same deference. *See id.* at 732-34. The Court viewed judicial review of ecclesiastic tribunals as striking at the very heart of religious freedom and held that allowing civil review would "deprive [religious] bodies of the right of

_____

[5] The Pfeils brought claims for defamation against Braun, Behnke, and St. Matthew. They also brought a negligence claim against St. Matthew, alleging that St. Matthew negligently allowed the defamation to occur. Because all of these claims have their factual basis in the allegedly defamatory statements made during church disciplinary proceedings, we analyze them together and generally refer to the defamatory statements as the basis for the Pfeils' claims.

6

construing their own church laws . . . and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions." *Id.* at 733-34. The essence of the Court's holding is captured in a now-famous quotation:

> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 728-29.

The U.S. Supreme Court strengthened the doctrine announced in *Watson* when it decided *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696 (1976).[6] In deciding that the Illinois Supreme Court had violated the First Amendment when it reinstated a defrocked bishop, the *Milivojevich* Court held that "where resolution of the disputes cannot be made without extensive

---

[6] *Watson* was a pre-*Erie* diversity case and was decided on the basis of federal common law, not the First Amendment. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115-16 (1952). Subsequently, however, *Kedroff* enshrined *Watson*'s theory of deference as a constitutional doctrine by grounding *Watson*'s holding in the First Amendment. *Id. Milivojevich* represents the first time the Court addressed the doctrine post-*Kedroff* and clearly constitutionalized the idea that the decisions of religious tribunals should be afforded significant deference under the First Amendment.

inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Id*. at 709.

But the autonomy granted to religious institutions by the First Amendment is not boundless. The U.S. Supreme Court has repeatedly emphasized that certain situations allow courts to use "neutral principles of law" to resolve controversies involving religious institutions and their parishioners. *Jones v. Wolf*, 443 U.S. 595, 602-05 (1979) (approving of the "neutral principles of law" approach as "consistent with the [First Amendment]" and stating that "[w]e cannot agree [with the dissent] that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved"); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (suggesting that courts could resolve church property disputes if they applied "neutral principles of law"). Indeed, we applied the neutral-principles approach in the context of a negligent counseling claim brought against a pastor by a former parishioner who received counseling services from the pastor. *See Odenthal v. Minn. Conference of Seventh-Day Adventists*, 649 N.W.2d 426, 430-36, 440-41 (Minn. 2002) (using the neutral principles contained in a statute regulating counseling activity to determine the standard of care applicable to a pastor providing counseling services).

8

The U.S. Supreme Court recently addressed the ecclesiastical abstention doctrine in 2012 when it decided *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, ___ U.S. ___, 132 S. Ct. 694 (2012). In *Hosanna-Tabor*, a unanimous Supreme Court adopted the so-called "ministerial exception," a derivative of the ecclesiastical abstention doctrine that had been endorsed for years in the federal circuit courts. *Id.* at ___, 132 S. Ct. at 705-06. The ministerial exception exempts churches and religious organizations from compliance with employment discrimination statutes when making decisions regarding ministerial employees. *Id.* at ___, 132 S. Ct. at 705-06. In adopting the ministerial exception, the *Hosanna-Tabor* Court relied heavily on *Watson*, *Kedroff*, and *Milivojevich*, and concluded that subjecting churches and religious organizations to discrimination laws in the context of ministerial employment decisions would "interfere[] with the internal governance of the church" and violate the Free Exercise Clause and the Establishment Clause of the First Amendment. *Id.* at ___, 132 S. Ct. at 706. The Court further indicated that whether the ecclesiastical abstention doctrine applies or whether neutral principles and secular law can be used in a given case turns on whether adjudication would result in "government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at ___, 132 S. Ct. at 707.

Although none of these Supreme Court cases speaks directly to the issues raised by the Pfeils' claims, several helpful rules can be drawn from them. First, a court cannot overturn the decisions of governing ecclesiastical bodies with respect to purely ecclesiastical concerns, such as internal church governance or church discipline. *See Watson*, 80 U.S. at 727. Second, a court may not entertain cases that require the court to

resolve doctrinal conflicts or interpret church doctrine. *See Milivojevich*, 426 U.S. at 720; *Mary Elizabeth*, 393 U.S. at 449. Finally, a court may decide disputes involving religious organizations, but only if the court is able to resolve the matter by relying exclusively on neutral principles of law, the court does not disturb the ruling of a governing ecclesiastical body with respect to issues of doctrine, and the adjudication does not "interfere[] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 707; *see also Wolf*, 443 U.S. at 602-05.

B.

Before addressing the specifics of this case, we must clarify one additional point about the ecclesiastical abstention doctrine. Previously, we have characterized the doctrine as a jurisdictional bar. *See Odenthal*, 649 N.W.2d at 430-34, 441. The district court, the court of appeals, and the parties also proceeded under the assumption that the doctrine limits a court's subject matter jurisdiction. *See Pfeil v. St. Matthews Evangelical Lutheran Church*, No. A14-0605, 2015 WL 134055, at *2-3 (Minn. App. Jan. 12, 2015). In *Hosanna-Tabor*, however, the U.S. Supreme Court clarified that the doctrine does not relate to subject matter jurisdiction. The Court resolved a disagreement among federal circuit courts and held that the ministerial exception actually functioned as an affirmative defense on the merits to an "otherwise cognizable" claim under a federal statute. ___ U.S. at ___, 132 S. Ct. at 709 n.4 ("We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is 'whether the allegations the plaintiff

10

makes entitle him to relief,' not whether the court has 'power to hear [the] case.' " (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010))).

The U.S. Supreme Court's holding in *Hosanna-Tabor* leads us to conclude that the ecclesiastical abstention doctrine is not a jurisdictional bar. When applied to a state-law tort claim, the doctrine could function as an affirmative defense on the merits, as it does in the context of federal anti-discrimination statutes. *See Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 709 n.4. But we do not believe that the U.S. Supreme Court's ruling in *Hosanna-Tabor* compels that result. The unique circumstances surrounding the decision in *Hosanna-Tabor*, particularly the fact that the Court was confronted with a statutory cause of action, provide us with some latitude to decide how the doctrine will be applied in Minnesota courts.

As mentioned above, one possible option is to treat the doctrine as an affirmative defense on the merits. We note, however, that the doctrine could also function as a form of abstention, as one of its names implies. We have previously suggested that Minnesota courts could abstain from certain cases. *See Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 290 (Minn. 1996) (discussing abstention in the context of a suit involving tortious acts, some of which were committed on tribal land). Abstention provides a narrow exception to a district court's obligation to hear the cases that are brought before it, allowing the court to dismiss a claim it would otherwise adjudicate. *Id*. Ordinarily, abstention is invoked when there is concurrent jurisdiction, or more than one court has been asked to adjudicate the same set of claims. *Id*. But abstention can also be a useful framework in cases where there are not "two competing lawsuits." *Id*.

11

The parties did not brief or argue the distinction between an affirmative defense and abstention. Because the issue was not briefed and is not essential to the disposition of this case, we decline to characterize the doctrine. *See State v. Schweppe*, 306 Minn. 395, 401 n.3, 237 N.W.2d 609, 614 n.3 (1975) (declining to decide an issue not briefed or argued by the parties). Instead, we hold only that the doctrine is not a jurisdictional bar to adjudication. We leave for another time the question of whether the doctrine is best viewed as an affirmative defense on the merits or a form of abstention.

### III.

In reaching the conclusion that adjudication of the Pfeils' claims was barred by the First Amendment, both the district court and the court of appeals relied heavily on two previous court of appeals decisions. In the first, *Black v. Snyder*, 471 N.W.2d 715 (Minn. App. 1991), *rev. denied* (Minn. Aug. 29, 1991), the court of appeals held that a former pastor could not bring a defamation claim and a whistleblower claim against the church that had terminated her based on statements that were made during the course of her termination.[7] *Id.* at 718, 720. Essentially, the *Snyder* court adopted what amounted to a ministerial exception. *See id.* at 720 (citing *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360-61 (D.C. Cir. 1990)). The court observed that "[w]hen claims involve 'core' questions of church discipline and internal governance, the Supreme Court has acknowledged that the inevitable danger of

---

[7] The court did allow the pastor to pursue a sexual-harassment claim based on the conduct of another pastor at the church because that claim was not based on the church's decision to terminate her employment and because that claim was unrelated to pastoral qualifications or issues of church doctrine. *Snyder*, 471 N.W.2d at 720-21.

12

governmental entanglement precludes judicial review." *Id.* (citing *Milivojevich*, 426 U.S. at 717, 721).

*Snyder*'s ruling was extended by *Schoenhals v. Mains*, 504 N.W.2d 233 (Minn. App. 1993). The *Mains* court held that two former parishioners could not sue their former pastor for defamation because their claim arose out of four statements the pastor made to the congregation when he was explaining his reasons for terminating the plaintiffs' membership in the church. *Id.* at 234-35. The court found that three out of the four allegedly defamatory statements could not serve as the basis for a claim because adjudicating the truth or falsity of the statements would require the court to interpret matters of church doctrine. *Id.* at 236. The court noted that one of the reasons stated for terminating the parishioners' membership—that they had engaged in the "direct fabrication of lies"—could possibly be adjudicated without interpreting or inquiring into church doctrine. *Id.* But, relying on *Snyder*, the *Mains* court found that adjudicating a defamation claim based on that statement would violate the First Amendment because it would require an inquiry into matters of church discipline. *Id.* (citing *Snyder*, 471 N.W.2d at 720).

Both the district court and the court of appeals concluded the holding in *Mains* was directly applicable to the Pfeils' case and held that adjudicating the Pfeils' claims would violate the First Amendment. *Pfeil*, 2015 WL 134055, at \*3-6. It is clear that if we adopt the rule from *Mains,* the Pfeils' claims should be dismissed. All of the statements on which the Pfeils base their claims occurred during church disciplinary proceedings, and *Mains* prohibits civil courts from inquiring into any statements made

13

during the course of a church disciplinary proceeding. 504 N.W.2d at 236. We are, of course, not bound by decisions of the court of appeals, and appellants urge us to modify the rule from *Mains* to allow defamation suits based on statements that are made during the course of church discipline proceedings when adjudicating the truth of the statements at issue would not require a court to interpret matters of religious doctrine.

A.

Respondents' primary argument is that adjudicating the Pfeils' claims would violate the First Amendment to the United States Constitution.[8] Issues of constitutional interpretation are questions of law that we review de novo. *State v. Shattuck*, 704 N.W.2d 131, 135 (Minn. 2005). We have traditionally analyzed the ecclesiastical abstention doctrine as an Establishment Clause question and applied the three-pronged test announced in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). *See, e.g.*, *Odenthal*, 649 N.W.2d at 435. In order to be valid under *Lemon*, "a state action must have a secular purpose, must neither inhibit nor advance religion in its primary effect, and must not foster excessive governmental entanglement with religion." *Odenthal*, 649 N.W.2d at

---

[8] Respondents also contend that the Pfeils' claims are barred by the Freedom of Conscience Clause in Article I, section 16 of the Minnesota Constitution. Respondents did not raise this argument below. This court does not typically consider constitutional issues that were not raised in the district court. *In re Welfare of C.L.L.*, 310 N.W.2d 555, 557 (Minn. 1981). At oral argument, respondents contended that the court should address their argument under the Minnesota Constitution because claims regarding subject matter jurisdiction cannot be waived. *See Dead Lake Ass'n v. Otter Tail Cty.*, 695 N.W.2d 129, 134 (Minn. 2005). Because we decide that the ecclesiastical abstention doctrine does not create a jurisdictional bar, we decline to reach respondents' arguments under the Minnesota Constitution—those arguments have been forfeited. *See In re Welfare of C.L.L.*, 310 N.W.2d at 557.

435. The parties agree that because defamation law serves a secular purpose and does not have the primary effect of advancing or inhibiting religion, only the excessive-entanglement question is in dispute.

It is worth noting that no U.S. Supreme Court case applying the ecclesiastical abstention doctrine has used the *Lemon* test or announced another general test. The *Hosanna-Tabor* court grounded the doctrine in both the Establishment and Free Exercise Clauses of the First Amendment, but provided no guidance on the applicability of more general Establishment Clause and Free Exercise Clause jurisprudence. *See* ___ U.S. at ___, 132 S. Ct. at 706. Regardless, *Lemon*'s entanglement prong and *Hosanna-Tabor*'s focus on whether adjudicating the claim would interfere with internal decisions that impact religious organizations' faith and mission appear to be substantially similar inquiries. Thus, we must determine whether allowing the Pfeils' claims to proceed will "foster excessive governmental entanglement with religion," *Odenthal*, 649 N.W.2d at 435 (citing *Lemon*, 403 U.S. at 612-13), or "interfere[] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 707.

## B.

Courts from other jurisdictions that have faced similar facts have generally adopted one of two approaches. Respondents urge us to adopt a rule that adjudicating any defamation claim arising out of a statement made during a church disciplinary

15

proceeding violates the First Amendment, as several other courts have done.[9]  The Pfeils have asked us to adopt a claim-by-claim, element-by-element approach to the ecclesiastical abstention doctrine.[10]  Specifically, the Pfeils direct us to *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084 (Pa. 2009), and argue that we should adopt the rule that the Pennsylvania Supreme Court announced in that case.

The *Connor* court ruled that a student who was expelled from a religious school could maintain an action for defamation based on statements made during the course of his expulsion.  *Id*. at 1113.  In reaching that ruling, the *Connor* court announced a broader rule to govern ecclesiastical abstention cases.  According to *Connor*, a court confronted with an ecclesiastical abstention issue should evaluate each individual claim brought by

---

[9]     *See Hutchison v. Thomas*, 789 F.2d 392 (6th Cir. 1986); *Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church in Am.*, 860 F. Supp. 1194 (W.D. Ky. 1994); *Farley v. Wisc. Evangelical Lutheran Synod*, 821 F. Supp. 1286 (D. Minn. 1993); *Higgins v. Maher*, 258 Cal. Rptr. 757 (Cal. Ct. App. 1989); *O'Connor v. Diocese of Honolulu*, 885 P.2d 361 (Haw. 1994); *Joon Ki Lee v. Byeong Ho Son*, No. 1-11-3217, 2012 WL 6962978 (Ill. Ct. App. Sept. 28, 2012); *Stepek v. Doe*, 910 N.E.2d 655 (Ill. Ct. App. 2009); *Purdum v. Purdum*, 301 P.3d 718 (Kan. Ct. App. 2013); *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929 (Mass. 2002); *Brady v. Pace*, 108 S.W.3d 54 (Mo. Ct. App. 2003); *Howard v. Covenant Apostolic Church, Inc.*, 705 N.E.2d 385 (Ohio Ct. App. 1997); *Ausley v. Shaw*, 193 S.W.3d 892 (Tenn. Ct. App. 2005); *Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, No. M2004-01066-COA-R9CV, 2007 WL 161035 (Tenn. Ct. App. Jan. 19, 2007); *Westbrook v. Penley*, 231 S.W.3d 389 (Tex. 2007).

[10]     *See Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468 (8th Cir. 1993); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241 (S.D.N.Y. 2014); *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732 (D.N.J. 1999); *McAdoo v. Diaz*, 884 P.2d 1385 (Alaska 1994); *Marshall v. Munro*, 845 P.2d 424 (Alaska 1993); *Lipscombe v. Crudup*, 888 A.2d 1171 (D.C. 2005); *Cargill v. Greater Salem Baptist Church*, 215 S.W.3d 63 (Ky. Ct. App. 2006); *Ciganik v. York*, No. 2013-P-0018, 2013 WL 6881611 (Ohio Ct. App. Dec. 31, 2013); *Connor v. Archdiocese of Phila.*, 975 A.2d 1084 (Pa. 2009); *Banks v. St. Matthew Baptist Church*, 750 S.E.2d 605 (S.C. 2013); *Bowie v. Murphy*, 624 S.E.2d 74 (Va. 2006).

16

the plaintiffs and determine whether it is "reasonably likely" that the plaintiffs could prove each element without intruding on the "sacred precincts." *Id*.

As an initial matter, the Pfeils have conceded here that the majority of the statements detailed in their second amended complaint cannot serve as the basis for a defamation claim, even under the more liberal rule announced in *Connor*, because adjudicating the truth or falsity of the statements would require the court to consider and interpret matters of church doctrine. *See Milivojevich*, 426 U.S. at 720; *Mary Elizabeth*, 393 U.S. at 449. For instance, a court could not decide whether the Pfeils were engaged in a "public display of sin" without interpreting the meaning of the word "sin" as a matter of Lutheran doctrine—a determination that would clearly be unconstitutional.

The Pfeils maintain that four of the statements discussed in the complaint can be adjudicated without violating the First Amendment: (1) that the Pfeils "perpetuated falsehoods" about St. Matthew and its pastors, (2) that the pastors of St. Matthew had received numerous complaints about the Pfeils' slander and gossip, (3) that the Pfeils accused Behnke of stealing money from the church shortly before the Synod hearing, and (4) that the Pfeils committed "breaches of confidentiality." The Pfeils argue that a court could use neutral principles of law to determine the truth of these statements and, consequently, adjudicating a claim based on these four statements would not lead to excessive entanglement with religion. Respondents and their amicus, the Lutheran Church-Missouri Synod, counter that the religious context in which these statements were made necessarily precludes judicial intervention.

17

C.

Respondents argue that allowing a court to adjudicate a claim based on statements made during a church disciplinary proceeding would unduly entangle the court with religion and severely interfere with the ability of religious organizations to govern their own affairs. To begin with, respondents posit that because the statements were made during the course of a church disciplinary hearing, each statement has some religious meaning and a court cannot simply sort so-called "secular" statements from "religious" ones.

This argument has merit. Many of the statements the Pfeils identified in their complaint are obviously religious in nature. Although other statements seem more secular in nature, it would certainly be difficult to differentiate between secular and religious statements, especially when the context in which the statements were made was clearly religious. A statement-by-statement analysis would be, at best, a difficult endeavor and, at worst, a court might be forced to interpret doctrine just to determine whether or not a statement had a religious meaning. It is precisely this sort of complicated and messy inquiry that we seek to avoid by prohibiting courts from becoming excessively entangled with religious institutions.

Respondents also argue that the Pfeils' claims are nothing more than an attempt to circumvent the U.S. Supreme Court's rulings in *Watson* and *Milivojevich* and obtain judicial review of the decision to excommunicate them. There is no doubt that the First Amendment protects the right of churches and religious organizations to make decisions regarding their membership. *See Watson*, 80 U.S. at 727. To some degree, the Pfeils'

18

defamation claims are a request to evaluate the accuracy of the facts used to support respondents' decision to excommunicate the Pfeils. Some courts that adopt an absolute position on adjudicating suits arising out of church disciplinary proceedings reason that "[t]he First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in a civil court." *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 937 (Mass. 2002).

In essence, respondents argue that immunity from defamation suits based on statements made during church disciplinary proceedings must necessarily be included within a church's First Amendment right to make membership decisions, lest that right ring hollow. Respondents stress that this is particularly true because exposing these proceedings and their participants to civil litigation will lead to a chilling effect. If church disciplinary proceedings are not shielded from the scrutiny of civil courts, there is a very real risk that those who participate will censor themselves in order to avoid liability or the threat of a lawsuit. *See Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987); *Westbrook v. Penley*, 231 S.W.3d 389, 400 (Tex. 2007).

In response, the Pfeils argue that the rule in *Connor* would provide sufficient protection to religious organizations by preventing courts from intruding into the "sacred precincts." The Pfeils seem to interpret intruding on the "sacred precincts" to be equivalent to interpreting church doctrine. But the Pennsylvania Supreme Court did not specify what would qualify as a "sacred precinct." In fact, the Pennsylvania Supreme

19

Court cited *Mains* with approval, indicating that our court of appeals made the correct decision by refusing to delve into statements made during a church disciplinary proceeding because adjudicating the parishioners' claims would have "obviously intrude[d] into the sacred precincts." *Connor*, 975 A.2d at 1108 (citing *Mains*, 504 N.W.2d at 234). Consequently, it is quite possible that even the *Connor* court would bar suits based on statements made during the course of a church disciplinary proceeding.

Additionally, the Pfeils fail to address the argument that determining which statements are secular and which are religious would, itself, create an excessive entanglement with religion. Although the Pfeils argue that defamation law provides sufficient protection for statements made during the course of a church disciplinary proceeding, we find this argument unpersuasive. This litigation and the arguments on which the Pfeils rely provide evidence to the contrary. Indeed, the fact that under Pfeils' rule "clearly religious" statements would be immune from suit while more factually based "secular" statements would not be only exacerbates the chilling effect of which respondents warn. Such a rule could perversely incentivize religious organizations to rely on amorphous and "doctrinal" reasons when making membership decisions in order to avoid any statements that could be construed as secular. Although not directly before us, the fact that Pfeils' rule would reward such behavior demonstrates that it would both

20

excessively entangle the court with religion and unduly interfere with the ability of religious organizations to make decisions regarding membership and internal discipline.[11]

The Pfeils make two additional arguments in an effort to support a statement-by-statement approach. First, they argue that the rule from *Mains* is itself unconstitutional because it provides an impermissible benefit to religious leaders and organizations, which is a violation of the Establishment Clause of the First Amendment. The Pfeils cite no case law in support of the proposition that shielding religious leaders and organizations from tort liability for their actions in the course of a church disciplinary proceeding would violate the Establishment Clause, and we have found none. In fact, the Pfeils' argument appears to be in tension with the U.S. Supreme Court's holding in *Hosanna-Tabor*, which broadly exempted religious organizations from federal anti-discrimination law in the context of ministerial employment decisions on the basis of the First Amendment. ___ U.S. at ___, 132 S. Ct. at 705-06. If the ministerial exception does not violate the Establishment Clause—and the U.S. Supreme Court clearly believes it does not—it is difficult to see how an exemption from tort liability in church disciplinary

---

[11]      We also reject the dissent's suggestion that a qualified privilege would sufficiently protect participants in a church disciplinary proceeding. Although a qualified privilege would provide greater protection than the rule advocated by appellants, it would still be insufficient. A qualified privilege only protects statements if the privilege is not "abused." *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 890 (Minn. 1986). "[T]he question of whether [a qualified] privilege was abused is a jury question." *Id.* Consequently, determining whether a statement is entitled to the protection of a qualified privilege requires extensive litigation. Thus, although a qualified privilege would provide some protection on the ultimate question of liability, it would do little to ameliorate the chilling effect that the specter of litigation can create. *See* discussion *supra* at 18-19.

21

proceedings could be unconstitutional. The Pfeils' contention that a rule barring defamation claims based on statements made during a church disciplinary proceeding violates the Establishment Clause of the First Amendment is meritless.

Second, the Pfeils argue that an absolute bar will lead to absurd results. For instance, they suggest that a pastor could hold a church discipline meeting, accuse a parishioner of molesting children while knowing the accusation is false, and face no liability. The dissent also advances this argument, discussing a similar, although not identical, hypothetical set of facts. These concerns have merit. We would of course be troubled by any case in which statements were made with the intent of abusing the ecclesiastical abstention doctrine and avoiding liability, particularly if the statements were disseminated to individuals outside of the religious organization. *See, e.g.*, *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404, 408 (Iowa 2003) (concluding that a statement made as part of a church disciplinary proceeding, but also disseminated outside the church and carrying at least some secular meaning, was not immune from liability). But those facts are not before us and we leave the resolution of such a case for another day.[12]

The reality, however, is that any rule that shields some individuals or organizations from liability will necessarily cause some otherwise meritorious claims to

---

[12] The dissent criticizes our failure to clarify how this rule of law would apply to various hypothetical facts. Although we recognize the dissent's concerns regarding future cases, it would be inappropriate to speculate on how the First Amendment may apply to hypothetical facts that are not before us. Those decisions must be left for another, properly presented, case or controversy. We hold only that, on the facts before us, adjudicating the Pfeils' claims would violate the First Amendment.

go uncompensated. It is clear that at least some statements and actions within the context of a church disciplinary proceeding are immune from liability—the Pfeils even admit as much. Certainly a claim for redress arising out of defamatory speech is a valued and important societal interest. But on the facts before us—where ministers made largely religious and doctrinal allegations as part of an excommunication proceeding and only disseminated those statements to members of the congregation—"the First Amendment has struck the balance for us." *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 710.

Finally, the dissent argues that our holding today represents a rejection of *Odenthal*. That is simply not the case. The dissent reasons that because no U.S. Supreme Court case directly prohibits the adjudication of the Pfeils' claims, we are bound to apply neutral principles under *Odenthal*. The dissent concludes that our refusal to apply neutral principles as we did in *Odenthal* amounts to an act of judicial policymaking on issues of immunity. But the dissent fundamentally misunderstands our holding.

*Odenthal* itself recognized that the Constitution prohibits courts from engaging in inquiries that cause "excessive entanglement" with religion. *See Odenthal*, 649 N.W.2d at 435-38. The U.S. Supreme Court reaffirmed this understanding in *Hosanna-Tabor* when it held that courts may not "interfere[] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 707. Today, we hold that adjudicating a defamation claim based on statements made during a church disciplinary proceeding and published only to members of the religious organization and its hierarchy would "interfere[] with an internal church decision that affects the faith and mission of the church itself," *id.*, and would excessively entangle the

23

courts with religion. *See Odenthal*, 649 N.W.2d at 435-38. As a result, such an adjudication is prohibited by the First Amendment. *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 707; *see Odenthal*, 649 N.W.2d at 435-38.

The absence of a U.S. Supreme Court decision directly on point with the decision we reach today does not constrain our ability to interpret the First Amendment in light of the cases the U.S. Supreme Court has decided. The U.S. Supreme Court's silence should not be interpreted as affirmative permission for courts to adjudicate these sorts of cases. Further, our holding does not represent a rejection of *Odenthal*. Rather, we simply recognize that adjudicating a defamation claim based on statements made during the course of a church disciplinary proceeding and published exclusively to members of the religious organization and its hierarchy necessarily fosters an excessive entanglement with religion, interferes with a religious organization's ability to make decisions that affect its faith and mission, and precludes the application of neutral principles of law.

Finally, our decision today is not an act of judicial policymaking. Rather, we conclude that the Pfeils' claims are barred as a matter of constitutional law, something very different than judicially created or statutorily enacted immunities. The immunity cases cited by the dissent involve circumstances in which the court was called upon to balance society's interest in providing a remedy to private citizens with its interest in providing immunity to certain groups or individuals. Although we take the dissent's point that some interests weigh against granting absolute immunity, "the First Amendment has struck the balance for us" in this case. *Hosanna-Tabor*, ___ U.S. at ___, 132 S. Ct. at 710.

24

The law places a premium on providing remedies to those injured. Sometimes, however, the courts cannot award a remedy, no matter how valid the claim. These are not easy decisions. But they are necessary decisions, particularly where, as here, the right to a remedy must be weighed against constitutionally enshrined commitments to religious freedom. We conclude that adjudicating Pfeils' claims would excessively entangle the courts with religion and unduly interfere with respondents' constitutional right to make autonomous decisions regarding the governance of their religious organization.

## IV.

In summary, we agree with respondents insofar as they argue that applying the issue-by-issue approach advocated by the Pfeils to this case would foster an excessive entanglement with religion, unduly interfere with the internal governance decisions of religious organizations, and violate the First Amendment. Ultimately, adjudicating Pfeils' claims would excessively entangle the courts with religion and unduly interfere with respondents' constitutional right to make autonomous decisions regarding the governance of their religious organization. We hold that the First Amendment prohibits holding an individual or organization liable for statements made in the context of a religious disciplinary proceeding when those statements are disseminated only to members of the church congregation or the organization's membership or hierarchy. As a result, the district court properly dismissed the claims brought by the Pfeils against St. Matthew and its pastors.

Affirmed.

25

HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CHUTICH, J., took no part in the consideration or decision of this case.

# D I S S E N T

LILLEHAUG, Justice (dissenting).


Today the court creates what is, essentially, an absolute privilege to defame in "formal church discipline proceedings." No matter how false and malicious the statement, and no matter how much the victim is damaged, there is no remedy whatsoever in Minnesota's courts.

The United States Supreme Court's jurisprudence on ecclesiastical abstention does not *require* this rule of law. Further, its categorical nature is contrary to our controlling precedent. In *Odenthal v. Minnesota Conference of Seventh-Day Adventists*, 649 N.W.2d 426 (Minn. 2002), we established the framework for liability for torts committed within religious organizations. *Odenthal* held that, although we may not inquire into or review the internal decisionmaking or governance of a religious organization, we may apply neutral principles of law if we can do so without excessive entanglement. *Id.* at 435-38.

Instead of following the *Odenthal* framework, the court simply labels it a "complicated and messy inquiry" and announces a new rule. Because the opinion of the court undermines the doctrine of stare decisis and may deprive victims of a remedy, I respectfully dissent.

## I.

It is black-letter constitutional law that we may not decide controverted questions of religious faith. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729-30 (1872); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115-16

D-1

(1952); *Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 708-10 (1976). As we acknowledged in *Odenthal*, "a state may not inquire into or review the internal decisionmaking or governance of a religious institution." 649 N.W.2d at 435 (citing *Jones v. Wolf*, 443 U.S. 595, 602 (1979)).

But we may decide a case involving a religious organization when the dispute can be resolved according to "neutral principles of law." *Id.* at 435; *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). There is no "compulsory deference to religious authority . . . where no issue of doctrinal controversy is involved." *Jones v. Wolf*, 443 U.S. 595, 605 (1979). As we said recently in *State v. Wenthe*, 839 N.W.2d 83, 90 (Minn. 2014): "No entanglement problem exists . . . when civil courts use neutral principles of law—rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines—to resolve disputes even though those disputes involve religious institutions or actors."

The most recent Supreme Court case applying the ecclesiastical abstention doctrine, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, ___ U.S. ___, 132 S. Ct. 694 (2012), is consistent with this principle. The court held that applying federal anti-discrimination employment law to ministerial employees would interfere with religious organizations' internal governance. *Id.* at ___, 132 S. Ct. at 706. To do so would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at ___, 132 S. Ct. at 707.

The issue in *Hosanna-Tabor*—the criteria for hiring and terminating ministerial employees—went directly to the heart of religious organizations' missions. "The church must be free to choose those who will guide it on its way." *Id.* at ___, 132 S. Ct. at 710. But the opinion of the court took care not to express a view on other types of suits, including tort claims that might be brought by an employee against a religious employer. *Id.* at ___, 132 S. Ct. at 710.

Here, the court admits that neither *Hosanna-Tabor* nor any other U.S. Supreme Court case "speaks directly to the issues raised by the Pfeils' claims." The U.S. Supreme Court has never suggested that the First Amendment requires what the court does today. Therefore, in the absence of higher and contrary judicial authority, we should apply our own controlling case, *Odenthal*, that established the framework to analyze state tort claims against religious organizations.

The tort claim alleged in *Odenthal* was for negligence in counseling. The plaintiff invoked several statutes governing the conduct of unlicensed mental-health practitioners. 649 N.W.2d at 436-37. The defendants, a minister and a religious organization, argued that the application of a tort standard of care drawn from a secular regulatory statute was barred by the First Amendment because adjudication would entangle the court in religion. *Id.* at 438. We rejected that argument. Relying on *Wolf*, 445 U.S. 595, we held that the state tort claim was based on neutral principles of law that set a minimum standard of care, and that the case could be decided without undue entanglement. *Odenthal*, 649 N.W.2d at 438, 441.

D-3

Nothing in *Odenthal* hints that adjudicating a particular kind of state tort claim is entangling per se.  To the contrary, it requires that we analyze state tort claims on a claim-by-claim basis.[1]

Like *Odenthal*, this is a case based on neutral principles of state tort law.  Like *Odenthal*, this case arises out of an activity considered part of a religious organization's mission.  Thus, there is no principled reason for the court to jettison the *Odenthal* framework and treat claims for defamation differently.

## II.

Unquestionably, religious organizations have a constitutionally protected right to make decisions regarding their membership.  Correctly, the Pfeils have not asked us to overturn their excommunication from St. Matthew Lutheran Church.  Instead, they ask us to do as *Odenthal* requires:  apply neutral principles of state defamation law, consider each allegedly defamatory statement, and, as to each, determine whether adjudication would excessively entangle us in religion.

Adjudicating certain kinds of allegedly defamatory statements would lead inevitably to entanglement.  Examples of such statements are found in the Pfeils' Second Amended Complaint.  The Pfeils plead that they were defamed when a minister said: "That Plaintiffs had publicly engaged in 'sinful behavior' " inside and outside of the congregation.  The Pfeils further plead that the minister defamed them with the words

---

[1]  As the opinion of the court demonstrates at footnotes 8 and 9, the majority of state supreme courts that have considered defamation claims arising out of religious disciplinary proceedings have applied the ecclesiastical abstention doctrine on a claim-by-claim basis, rather than as a categorical bar.

that the Pfeils had "refus[ed] to follow the commands of God's Word and Scriptural warnings by elected leaders of the congregation." Obviously, we would be entangled excessively in religion if we tried to adjudicate what is "sinful behavior" or whether someone refused to follow "the commands of God's Word."

But there are clear instances in which we can apply neutral principles of state defamation law to adjudicate defamation claims without excessive entanglement. Imagine a religious disciplinary proceeding in which a member has been charged with teaching false doctrine in the Sunday school. Plainly, we could not adjudicate any dispute regarding "false doctrine." But, assume that, in response, the member says, maliciously and without a shred of truth: "The charge that I'm harming the Sunday school is ironic, given that the minister regularly sexually assaults the kids in the class." As is true of many vicious accusations, inevitably such a defamatory statement would spread like wildfire through the religious organization and into the community, causing great injury. Applying the *Odenthal* framework, a district court could likely use neutral principles of state defamation law to adjudicate the minister's defamation claim without excessive entanglement.

This is not to say that applying the test of excessive entanglement is always easy. There may be close cases when the analysis becomes, as the court puts it, "complicated and messy." But I reject the court's notion that the process of making a decision about excessive entanglement itself constitutes excessive entanglement. Such decisions are part of the judicial function, and we have made them as a matter of course. *See, e.g.*, *Wenthe*, 839 N.W.2d at 90-92; *Odenthal*, 649 N.W.2d at 434-41. We should have done so here.

## III.

Instead, the court announces a categorical rule of law, closely akin to an absolute privilege to defame, thereby denying a state court remedy for a state tort. The court virtually inoculates speakers from liability for even their most outrageous false, malicious, and damaging statements that may have only a remote connection to any religious doctrine or mission.

Because this new privilege is not required by the United States Supreme Court's constitutional jurisprudence, it must be the product of judicial policy making. Historically, our policy has been that, because they deprive defamation victims of a remedy, absolute privileges should be rare creatures. "Absolute privilege is not lightly granted," *Zutz v. Nelson*, 788 N.W.2d 58, 62 (Minn. 2010), and is "confined within narrow limits," *Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954). As we said in *Zutz*, we only extend absolute privilege "when public policy weighs *strongly* in favor of such extension." 788 N.W.2d at 66 (emphasis added).

Although religious freedom is, of course, a strong public policy, the court does not demonstrate that the possibility of defamation liability "unduly interfere[s]" with that freedom. Nor does the court discuss why religious organizations cannot procure insurance to protect themselves from defamation liability.

On the other hand, the court concedes that there is "merit" to concerns about injustice to defamation victims. It tries to limit the inoculation from liability it grants with a proviso: the rule of law applies only to statements made "during the course of formal discipline proceedings" and "communicated only to other members of the church

and participants." This proviso ignores the reality of how defamation can devastate its victims. Any statement made in a closed meeting of "members" and "participants" is unlikely to stay there. More likely, a vicious falsity uttered in a small-town house of worship will be avidly republished, starting the very next morning during coffee at the Chatterbox Café.

A qualified privilege, rather than an absolute privilege, would strike a much better balance between a defamation victim's right to a remedy and a religious organization's right to discipline. Under Section 596 of the Restatement (Second) of Torts, a qualified privilege is available "for communications among [members of a religious organization] concerning the qualifications of the officers and members and their participation in the activities of the society." *Id.* § 596 cmt. e (1977). We have recognized a similar privilege for communications in the context of employment. *See Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889-90 (Minn. 1986); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256-57 (Minn. 1980). A qualified privilege should have eased the court's concerns.

## IV.

Under the guise of avoiding a "complicated and messy" entanglement analysis, the court's rule of law creates its own set of complications. The opinion creates a liability-free zone, but does not properly mark and fence the boundaries. As a result, the zone is both over-inclusive and under-inclusive.

First, the court does not explain precisely which claimants, besides the Pfeils, lose their defamation remedy. A defamatory statement during a religious disciplinary

proceeding might be *heard* by only members and participants, but might be *about* a non-member third party. I suspect that, under the court's rule of law announced t oday, third-party victims would not have a state court remedy. But this is not clear.

Second, the court does not tell us what it means by "membership" and "formal church disciplinary proceedings." Religious organizations' understandings of "membership" and "formal disciplinary proceedings" vary widely. Some religious organizations have clearly defined indicia of what it means to belong; others do not. Some organizations have rules-based governance; others revolve around the thoughts of a single charismatic leader. Some organizations have complicated adjudicatory systems with several levels of appeal; others have nothing of the sort. By using words such as "formal" and "membership," the opinion sends us into more religious tangles than it avoids.

Finally, it is difficult to discern why the court's categorical rule of law insulating religious actors from defamation claims would not extend to and insulate those actors from liability for other torts. The court's opinion necessarily raises the question of whether the state judiciary can adjudicate other state tort claims allegedly committed in connection with religious discipline, such as battery, fraud, false imprisonment, and negligent counseling.

V.

Had the court applied the *Odenthal* framework, it would have held that it could use neutral principles of law: Minnesota's law of defamation. Then it would have analyzed the allegedly defamatory statements, one by one, to determine whether each

could be resolved without excessive entanglement. Had it done so, it would have concluded that adjudicating most of the statements would be entangling. It also would have concluded that most were not actionable because they were matters of opinion.[2] *See, e.g.*, *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013) (calling a physician a "real tool" is an opinion that cannot be the basis for a defamation action).

One statement, though, appears to be capable of adjudication without excessive entanglement. Paragraph 12 of the Second Amended Complaint alleges that a minister stated that the Pfeils had "accused [him] of stealing money from" St. Matthew Lutheran Church. The Pfeils allege that they made no such accusation. In other words, they contend that the minister falsely accused them of making a false accusation of the crime of theft.

Whether or not the Pfeils accused the minister of theft has little to do with the underlying disciplinary proceeding. I see no reason why a court and jury could not apply neutral principles of law without entanglement to determine whether: (1) the minister made the alleged statement; (2) it was false; (3) it was damaging to reputation; and (4) it was not protected by a qualified privilege. *See Stuempges*, 297 N.W.2d at 255-57.

Therefore, the court should have reversed the court of appeals and remanded the case to the district court to apply the *Odenthal* framework on a statement-by-statement

---

[2]    *E.g.*, "That Plaintiffs had 'refused to show respect' towards servants of God and St. Matthew Lutheran Church leadership," and "That . . . Plaintiffs 'openly and intentionally attempted to discredit the integrity of the pastors and church leaders.' " On their face, these are matters of opinion.

basis.  Any surviving defamation and negligence claims would then be subject to all available defenses, including qualified privilege.

For all of these reasons, I respectfully dissent.


GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Lillehaug.