IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**HWAL'BAY BA: J ENTERPRISES, INC.,**
*Petitioner,*

*v.*

**HONORABLE LEE F. JANTZEN, JUDGE OF THE SUPERIOR COURT
OF THE STATE OF ARIZONA, IN AND FOR THE
COUNTY OF MOHAVE,**
*Respondent Judge,*

*and*

**SARA AND WILLIAM FOX,**
*Real Parties in Interest.*

---

No. CV-19-0123-PR
Filed February 25, 2020

---

Appeal from the Superior Court in Mohave County
The Honorable Lee F. Jantzen, Judge
No. CV2018-00428
**AFFIRMED**

Order of the Court of Appeals, Division One
1 CA-SA 19-0059
Filed April 03, 2019

---

COUNSEL:

D. Samuel Coffman (argued), Mitesh V. Patel, Vail C. Cloar, Dickinson Wright PLLC, Phoenix; Verrin T. Kewenvoyouma, Kewenvoyouma Law, PLLC, Tempe, Attorneys for Hwal'Bay Ba: J Enterprises, Inc.

David L. Abney (argued), Ahwatukee Legal Office, P.C., Phoenix; John P. Torgenson, Jon T. Drago, Torgenson Law, Phoenix, Attorneys for Sara and William Fox

William A. Nebeker, John M. Sticht, Koeller, Nebeker, Carlson & Haluck LLP, Phoenix, Attorneys for Amicus Curiae Grand Canyon Custom Tours, Inc.

Doreen N. McPaul, Attorney General, Navajo Nation Department of Justice, Window Rock; Susan B. Montgomery, Jay Tomkus, Montgomery & Interpreter, PLC, Phoenix; Sam Hirsch, Jenner & Block LLP, Washington, DC, Attorneys for Amici Curiae The National Congress of American Indians Fund, The Inter Tribal Association of Arizona, Inc., and The Navajo Nation

———————————

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, GOULD, LOPEZ, BEENE and MONTGOMERY joined. JUSTICE BOLICK filed a concurring opinion.

———————————

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        An Indian tribe's "subordinate economic organization" serves as an "arm of the tribe" and therefore shares its sovereign immunity. This tort case affords us an opportunity to identify factors courts should examine to decide whether a tribal entity serves in that capacity. After doing so, we conclude the tribal entity here did not prove it is a subordinate economic organization entitled to share the tribe's immunity, and the superior court therefore did not err by denying the entity's motion to dismiss.

**BACKGROUND**

¶2        In April 2016, Sara Fox was seriously injured while white-water rafting on the Colorado River through the Grand Canyon. Arizona holds title to the lands beneath the river, and Fox therefore suffered her injuries on state land. *See Morgan v. Colo. River Indian Tribe*, 103 Ariz. 425, 427 (1968). The rafting boat was operated by employees of Hwal'Bay Ba: J Enterprises, Inc., which does business under the trade name Grand Canyon

Resort Corporation ("GCRC"). GCRC is a tribal corporation whose sole shareholder is the Hualapai Indian Tribe (the "Tribe"), a federally recognized Indian tribe. The Hualapai Reservation is contiguous to parts of the Colorado River.

¶3 Fox and her husband filed suit against GCRC, the Tribe, and unidentified "John Does" seeking compensatory and punitive damages. The Foxes also sued Grand Canyon Custom Tours, Inc. ("GCCT"), an Arizona corporation, which sold them the rafting trip in an online transaction. GCCT is not affiliated with the Tribe but served as GCRC's booking agent. Foxes' claims against GCCT are not before us.

¶4 The Tribe and GCRC moved to dismiss the complaint pursuant to Rules 12(b)(2) and (5), Arizona Rules of Civil Procedure, arguing they possessed sovereign immunity from suit, which precluded the court from exercising personal jurisdiction, and they were not properly served. After briefing and argument, the court found that the Foxes had properly served both defendants. It dismissed the complaint against the Tribe on sovereign immunity grounds but declined to dismiss the complaint against GCRC, finding it not protected by sovereign immunity. The court denied GCRC's request to reconsider that decision.

¶5 GCRC unsuccessfully petitioned the court of appeals for special action relief from the superior court's partial denial of the motion to dismiss. We granted review to decide the circumstances under which a tribal entity enjoys sovereign immunity as a "subordinate economic organization" of the tribe, a recurring issue of statewide importance.

## DISCUSSION

### I. General principles

### A. Sovereign immunity

¶6 Indian tribes, as "domestic dependent nations," are immune from lawsuits in state and federal court, unless that immunity is waived by the tribe or abrogated by Congress. *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991). Sovereign immunity applies to a tribe's commercial and government activities, conducted both on and off the reservation. *See*

*Kiowa*, 523 U.S. at 760. Sovereign immunity does not shield individual tribal employees sued in their personal capacities, even if the tribe is obligated to indemnify them. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1288 (2017).

## B. Subordinate economic organizations

¶7 Sovereign immunity also applies to a subordinate economic organization, which is considered an arm of the tribe. *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 7 (1971); *see also Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 705 n.1 (2003) ("The United States maintains, and the County does not dispute, that the Corporation is an 'arm' of the Tribe for sovereign immunity purposes."). Recognizing immunity for subordinate economic organizations permits tribes to conduct commercial activities through subordinate governmental agencies without unintentionally waiving sovereign immunity. *See Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 256 (1989); *see also Shelley*, 107 Ariz. at 7 (concluding "it would defeat the purpose of Congress in granting immunity to Indian Tribes" if subordinate economic organizations of a tribe were not cloaked with sovereign immunity).

¶8 The issue before us is whether GCRC is immune from suit as a subordinate economic organization of the Tribe, or, as the superior court ruled, has no immunity because it is an entity separate and distinct from the Tribe. GCRC bears the burden of demonstrating its immunity by a preponderance of the evidence. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *People v. Miami Nation Enters.*, 386 P.3d 357, 365 (Cal. 2016). We review the superior court's denial of GCRC's motion to dismiss for an abuse of discretion, although we decide the legal issues underlying that ruling de novo. *See Leach v. Reagan*, 245 Ariz. 430, 441 ¶ 53 (2018); *Nataros v. Superior Court*, 113 Ariz. 498, 499-500 (1976).

¶9 We have not established a test to identify subordinate economic organizations, and no nationwide consensus exists on the appropriate inquiry. *See Miami Nation Enters.*, 386 P.3d at 366 ("In the absence of guidance from the high court, state and federal courts have articulated a variety of arm-of-the-tribe tests."). Generally, courts outside Arizona have relied on one or more factors, such as examining an entity's creation, purpose, ownership, governance, and financial relationship with the tribe and the tribe's intent concerning the applicability of sovereign immunity. *See id.* at 366–67 (summarizing approaches taken by state and

federal courts). In adopting the appropriate framework for deciding whether an entity is a subordinate economic organization and thus an arm of the tribe, we are guided by prior Arizona cases, authorities outside our state, and the purposes underlying sovereign immunity for Indian tribes.

¶10 This Court first addressed subordinate economic entities in *Shelley*, which concerned a breach-of-contract suit filed in superior court against the Fort Apache Timber Company ("FATCO"). The White Mountain Apache Indian Tribe created FATCO as an unincorporated entity. *Shelley*, 107 Ariz. at 7. Nevertheless, the superior court ruled FATCO was either a corporation by estoppel or a de facto corporation, making it a separate legal entity not entitled to share the tribe's immunity. *Id.* at 5.

¶11 This Court reversed. *Id.* at 7–8. We examined FATCO's relationship with the tribe to determine whether FATCO shared the tribe's sovereign immunity. *Id.* at 5–6. The Court initially noted that the tribal constitution authorized the tribe to create FATCO for economic purposes. *Id.* It also relied on FATCO's plan of operation, which provided that FATCO was created to serve the economic and employment interests of the tribe and its members, including business training, and authorized the tribe to establish qualifications for board members, appoint and suspend members, and set member salaries. *Id.* at 6. The plan also stated that the White Mountain Apache owned FATCO, all FATCO property was titled in the tribe's name, and all purchases had to be made through the tribal purchasing agent and in compliance with tribal policies. *Id.* FATCO's board of directors was authorized to act "for and on behalf of" the tribe in all phases of the business. *Id.* Based on these facts, the Court concluded FATCO was "part of the tribe" and thus entitled to share its sovereign immunity. *Id.* at 7–8.

¶12 In *S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community*, 138 Ariz. 378 (App. 1983), the court of appeals addressed whether sovereign immunity barred a breach-of-contract claim against Gila River Farms ("GRF"), an unincorporated entity. Resolution of the dispute depended on whether GRF was created and controlled by the Gila River Indian Community (the "Community"), which was organized for governmental purposes under section 16 of the Indian Reorganization (Wheeler-Howard) Act, 25 U.S.C. § 5123, or by the Gila River Pima-Maricopa Indian Community (the "Indian Corporation"), which was incorporated for business or commercial purposes under section 17 of that Act, 25 U.S.C. § 5124, and had waived immunity from suit. *Id.* at 379–80,

382, 386. Relying on *Shelley*, the court concluded GRF was a subordinate economic organization of the Community, not the Indian Corporation, and therefore shared the Community's sovereign immunity. *Id.* at 381. It cited evidence that the Community's constitution and bylaws authorized it to create subordinate organizations for economic purposes; GRF existed to serve the Community and its members' economic and employment interests; and the Community's ownership of GRF property and managerial oversight made GRF "an integral part of the Community." *Id.*

¶13        This Court next addressed subordinate economic entities in *Dixon*. Dixon was injured off-reservation when a truck owned by Picopa Construction Company ("Picopa") rear-ended her car. *Dixon*, 160 Ariz. at 252. She sued Picopa, which claimed sovereign immunity due to its status as a tribal corporation created by the Salt River Pima-Maricopa Indian Community. *Id.* at 252–53. Contrasting the circumstances with those in *Shelley* and *S. Unique*, the Court concluded Picopa was not a subordinate economic organization of the tribe entitled to immunity. *Id.* at 256.

¶14        In reaching its decision, the *Dixon* Court cited several factors that differentiated Picopa from FATCO and GRF. *Id.* at 256–57. Unlike the latter entities, Picopa was incorporated, making it an "artificial individual," which the tribe had imbued with authority to act "to the same extent as natural persons might or could do." *Id.* at 258 (quoting Community Ordinance No. SRO-85-84 ¶ C). Picopa's corporate status "weigh[ed] heavily" against characterizing it as a subordinate economic organization. *Id.* Unlike the entities in *Shelley* and *S. Unique*, Picopa was managed by a board of directors rather than the tribal government. *Id.* at 256. Picopa's charter relieved the tribe from any corporate liability, and general liability insurance covered Picopa's negligent acts, thereby insulating the tribe's assets from Picopa's debts and evidencing the tribe's expectation that Picopa would be liable for torts. *Id.* at 256–57. The tribe formed Picopa for "business purposes" but, unlike in *Shelley* and *S. Unique*, did not declare an objective of promoting "general tribal or economic development." *Id.* at 257. "Most importantly," Picopa was not created to help the tribe carry out its government functions. *Id.* "Picopa was simply a for-profit corporation involved in construction projects." *Id.*

¶15        The Court also found that extending immunity to Picopa would not further several federal policies underlying sovereign immunity. *See id.* at 258–59. Extending immunity to Picopa was not necessary to protect tribal assets due to the existence of the limited liability clause in the

corporate charter and liability insurance. *Id.* at 258. Denying immunity to Picopa would not hinder tribal cultural autonomy and self-determination because Picopa was created for purely commercial reasons rather than to develop tribal interests, and a private lawsuit based on an off-reservation tort would not limit the tribe's exercise of its powers. *Id.* at 258–59. Finally, the Court found that denying immunity to Picopa would further the federal government's policy of promoting commercial dealings between Indian tribes and non-Indians. *Id.* at 259 ("Non-Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit.").

**¶16** Sorting through *Shelley*, *S. Unique*, *Dixon*, and cases outside Arizona, we identify and adopt six non-exclusive factors to examine in deciding whether an entity is a subordinate economic organization of a tribe, entitling it to share in the tribe's sovereign immunity:

**¶17** (1) The entity's creation and business form. The court should consider who created the entity, under what authority, and the entity's structural form, e.g., an unincorporated enterprise, a partnership with a non-Indian entity, or a corporation. Creation by the section 16 governmental organization of the tribe pursuant to its constitution weighs in favor of finding that the entity is a subordinate economic organization. *See Shelley*, 107 Ariz. at 5–6; *S. Unique*, 138 Ariz. at 381; *see also Miami Nation Enters.*, 386 P.3d at 372 (stating that "whether the tribe initiated or simply absorbed an operational commercial enterprise" is relevant). If the entity was created by the tribe's section 17 commercial corporation, which itself waived immunity, the entity is less likely a subordinate economic organization of the tribe. *See S. Unique*, 138 Ariz. at 383-84, 386. Also, if the entity is a corporation, that fact "weighs heavily" against finding it is a subordinate economic organization. *See Dixon*, 160 Ariz. at 258. This is so because incorporation establishes the entity as "separate and distinct" from the tribe, *Shelley*, 107 Ariz. at 5, may imply a waiver of immunity, *see Dixon*, 160 Ariz. at 258, and itself furthers a policy underlying sovereign immunity by insulating the tribe's assets from corporate liability, *see id.*

**¶18** (2) The entity's purpose. Pertinent here is whether the entity exists solely as a profit-making venture that merely generates revenue for the tribe or its members, or whether it also assists the tribe in carrying out its governmental functions, such as promoting tribal or economic development, preserving cultural autonomy, or funding governmental services. *See Dixon*, 160 Ariz. at 257; *Shelley*, 107 Ariz. at 6; *Miami Nation*

*Enters.*, 386 P.3d at 372.  If the entity's purpose is solely to engage in commercial activity, this factor weighs against immunity.  *See Dixon*, 160 Ariz. at 257.  But if the purpose is to further goals of tribal self-governance, even if the entity also has a commercial purpose, this factor weighs in favor of immunity.  *See id.*; *Shelley*, 107 Ariz. at 6; *S. Unique*, 138 Ariz. at 381.  We agree with the California Supreme Court that a court should examine both the entity's declared purpose "and the degree to which the entity actually serves that purpose" to determine whether "its activities [are] sufficiently germane to tribal self-governance."  *Miami Nation Enters.*, 386 P.3d at 372.  The more the entity actually serves the tribe in carrying out governmental functions, the more likely the entity is a subordinate economic organization.

**¶19**        (3) <u>The business relationship between the tribe and the entity</u>. Under this factor, a court examines the structure, management, and ownership of the entity.  This inquiry should illuminate the tribe's ownership interest and the amount of control exercised by it over the entity's affairs.  "Control" does not require directing day-to-day operations but addresses the tribe's involvement in the direction and control of the entity.  *See id.* at 373 (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 295 (Minn. 1996)).  "Evidence that the tribe actively directs or oversees the operation of the entity weighs in favor of immunity; evidence that the tribe is a passive owner, neglects its governance roles, or otherwise exercises little or no control or oversight weighs against immunity."  *Id.*; *see also Dixon*, 160 Ariz. at 256 (stating that unlike the circumstances in *Shelley* and *S. Unique*, "Picopa has a board of directors, *separate from the tribal government*, which exercises full managerial control over the corporation").

**¶20**        A tribe's shared ownership of an entity suggests it is not an "arm of the tribe" entitled to shared immunity.  *See Miami Nation Enters.*, 386 P.3d at 373 (agreeing "indirect ownership and control of the tribal corporation weighs against a finding of immunity" (citation omitted) (internal quotation marks omitted)).  Conversely, a tribe's ownership of property used by the entity for its business pursuits weighs in favor of finding that the entity is a subordinate economic organization.  *See Shelley*, 107 Ariz. at 6; *S. Unique*, 138 Ariz. at 381.

**¶21**        The court should also determine whether the entity represents the tribe in any capacity.  *See Shelley*, 107 Ariz. at 6 (noting FATCO's board had "full authority to act for and on behalf of" the tribe in all phases of FATCO's operations); *S. Unique*, 138 Ariz. at 381 (stating GRF's board "represent[ed] the Community in all matters" (alterations accepted)).

The more the entity represents the tribe's interests, the more likely the entity serves as an arm of the tribe.

**¶22** (4) <u>The tribe's intent to share immunity with the entity</u>. The court should be less inclined to conclude that an entity shares a tribe's immunity if the tribe itself did not intend this result. The tribe's intent is reflected not only by declarations but by actions. Thus, for example, an entity's obligation to indemnify and hold the tribe harmless for the entity's tort liability, or the procurement of liability insurance protecting the tribe and the entity from the entity's negligence, evidences the tribe's expectation that the entity would be responsible for its torts. *See Dixon*, 160 Ariz. at 256–57.

**¶23** (5) <u>The financial relationship between the entity and the tribe</u>. The court should determine whether the tribe's assets are protected from judgments entered against the entity. *See id.*; *Miami Nation Enters.*, 386 P.3d at 373. But even if tribal assets are not directly at risk, the court must consider whether enforcement of any judgment against the entity would "effectively strike a blow against the tribal treasury" due to the tribe's heavy dependence on entity revenues to fund governmental functions. *See Miami Nation Enters.*, 386 P.3d at 373. "If a significant percentage of the entity's revenue flows to the tribe, or if a judgment against the entity would significantly affect the tribal treasury, this factor will weigh in favor of immunity even if the entity's liability is formally limited." *Id.*

**¶24** (6) <u>Whether immunizing the entity furthers federal policies underlying sovereign immunity</u>. Although policies underlying sovereign immunity are embedded within factors 1 through 5, the court should nevertheless separately consider whether recognizing sovereign immunity for the tribal entity would further these policies. *See Dixon*, 160 Ariz. at 258 ("Tribal immunity should only apply when doing so furthers the federal policies behind the immunity doctrine.").

**¶25** The factors we identify today largely align with those identified by other courts. *See, e.g.*, *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181 (10th Cir. 2010); *Miami Nation Enters.*, 386 P.3d at 365. In considering them, the objective is to determine whether the entity is "part of the tribe" and serves as the tribe's vehicle for conducting its affairs, thereby entitling it to share the tribe's immunity. *See Shelley*, 107 Ariz. at 7–8. In doing so, a court should consider "both formal and functional considerations—in other words, not only the

legal or organizational relationship between the tribe and the entity, but also the practical operation of the entity in relation to the tribe." *Miami Nation Enters.*, 386 P.3d at 365. "Arm-of-the-tribe immunity must not become a doctrine of form over substance. The ultimate purpose of the inquiry is to determine 'whether the entity *acts* as an arm of the tribe so that its *activities* are properly deemed to be those of the tribe.'" *Id.* at 375 (quoting *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006)). Ordinarily, therefore, an entity must produce more than its plan of organization, bylaws, and the like to prove its entitlement to sovereign immunity. Evidence demonstrating the functional relationship between the tribe and the entity should also be provided to demonstrate that the entity is — in practice and on paper — an arm of the tribe.

**¶26** After considering factors 1 through 6, the court should decide whether they collectively weigh in favor of a finding that the entity is a subordinate economic organization of the tribe. If the entity has met its burden of showing they do, the entity is cloaked with sovereign immunity, unless that protection has been waived or abrogated by Congress. If not, the entity is not immune from suit.

## II. Application to this case

**¶27** On this record, we are unable to conclude that GCRC satisfied its burden to prove it is a subordinate economic organization of the Tribe, entitled to share in sovereign immunity. To prove it is an arm of the Tribe, GCRC provided the superior court with its plan of organization, its bylaws, the tribal constitution, the Tribe's corporate charter issued under section 17 of the Wheeler-Howard Act, and amendments to these documents. On paper, many attributes of the relationship between the Tribe and GCRC support a conclusion the latter is a subordinate economic organization of the former. For example, the Tribe's constitution authorizes the tribal council to "manage all tribal economic affairs and enterprises" and "establish and regulate subordinate organizations for economic and other purposes"; the council passed a resolution to adopt a plan of organization and bylaws for GCRC; the plan of organization claims sovereign immunity for GCRC, which it cannot waive without council permission; the Tribe capitalized GCRC and is authorized to make additional capital investments or loans; the Tribe is GCRC's sole shareholder and cannot transfer or pledge its stock; the council appoints GCRC's board of directors and can suspend or remove them for any reason; GCRC must make monthly reports to the council; and the board must get the council's consent before making several

business decisions, including making expenditures greater than $50,000, borrowing that amount, and selling "all or substantially all" of its assets.

¶28            Other evidence, however, suggests GCRC is not a subordinate economic organization of the Tribe. For example, GCRC is a tribal corporation; GCRC's assets do not belong to the Tribe; although GCRC "initially" intended to "creat[e] economic development opportunities" for the Tribe, it was "organized for the purpose of conducting all lawful affairs for which corporations may be organized"; control and operation of GCRC is vested in a board of directors, which can hire officers, make investment decisions, borrow funds, and enter in contracts; GCRC may "merge, consolidate, reorganize, [and] recapitalize" without tribal council participation if necessary to maintain its exemption from federal tax; and the Tribe is prohibited from "interfer[ing] with or giv[ing] orders or instructions to the officers or employees of GCRC" regarding day-to-day operations.

¶29            The record does not contain evidence addressing several significant functional attributes of the relationship between the Tribe and GCRC. For example, we do not know whether GCRC's revenues fund any governmental functions of the Tribe or, if they do, the extent to which the Tribe depends on GCRC revenues for these functions. The record does not reflect whether GCRC's business is confined to operating rafting trips or is broader in scope. We also cannot discern how GCRC contributes to the general tribal and economic development. Does it train Tribal members? Employ them? We do not know. And nothing reflects the level of control and oversight the Tribe actually exercises over GCRC as the plan of operation authorizes the Tribe to do.

¶30            In sum, on this record, we are unable to conclude that GCRC has carried its burden to show it is a subordinate economic organization of the Tribe so that a denial of immunity would "appreciably impair" the Tribe's "economic development, cultural autonomy, or self-governance." *See Miami Nation Enters.*, 386 P.3d at 376. Thus, based on this record, the superior court did not abuse its discretion by refusing to dismiss GCRC. GCRC may renew its request, with additional evidence to permit the court to apply the factors identified here and make an informed decision regarding whether GCRC is a subordinate economic organization of the Tribe. In light of our decision, we need not address the Foxes' additional arguments supporting the superior court's ruling.

**CONCLUSION**

¶31        Based on the record here, GCRC did not prove it is entitled to sovereign immunity.  The superior court therefore did not err by denying its motion to dismiss the Foxes' complaint against it.  We affirm the superior court's order.

BOLICK, J., concurring:

¶32        I concur fully in the Court's decision but write separately to emphasize an essential element in the analysis that is largely missing from the United States Supreme Court precedents we must follow.

¶33        Plaintiff Sara Fox was grievously injured in a river-rafting accident that occurred on state land.  Under our state Constitution, she is assured that the "right of action to recover damages shall never be abrogated."  Ariz. Const. art. 18, § 6.  But by the coincidental misfortune that the river-rafting company whose services she procured through an Arizona corporate intermediary is owned by an Indian tribe, that guarantee may be eviscerated.

¶34        The analysis of whether a tribal enterprise is a "subordinate economic organization" and therefore entitled to clothe itself in tribal immunity is determined by reference to statutes enacted pursuant to article 1, section 8 of the Federal Constitution, which authorizes Congress to "regulate commerce . . . with the Indian tribes."  But an analysis focusing solely on what the federal government has authorized and what tribes are doing pursuant to such authorization omits an important consideration: the constitutional authority of the states, which (along with the people) retain all powers not expressly delegated by the Constitution to the national government nor forbidden by it to the states.  *See* U.S. Const. amend. X.

¶35        This case implicates state interests of the highest order.  In our federal system, the states retain the police power to protect the health and safety of their citizens.  *See, e.g.*, *Simpson v. Miller*, 241 Ariz. 341, 345 ¶ 8 (2017) ("In our federalist system of dual sovereignty, states retain certain antecedent powers . . . ."); *Indus. Comm'n v. Navajo Cty.*, 64 Ariz. 172, 180 (1946) (stating that "the police power is inalienable" (emphasis removed)).

The framers of the Arizona Constitution deemed the right to recover damages for injuries so fundamental that they protected it not only in article 18, section 6, but in our Declaration of Rights as well.  *See* Ariz. Const. art. 2, § 31 ("No law shall be enacted in this state limiting the amount of damages to be recovered for causing the death or injury of any person . . . . ").  As the Arizona Constitution is "our basic charter[] of state governance . . . ., we strive wherever possible to uphold [its] provisions." *Miller*, 241 Ariz. at 341 ¶ 8 (citation omitted).

¶36        As Justice Thomas has observed, "the Constitution does not grant Congress power to override state law whenever that law happens to be applied to Indians." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 666 (2013) (Thomas, J., concurring).  Specifically, the text of the Indian Commerce Clause "confirms that Congress may only regulate commercial interactions—'commerce'—taking place with established Indian communities—'tribes.'  That power is far from 'plenary.'" *Id.* at 660.

¶37        It is one thing to recognize immunity for a tribe exercising its sovereignty within its own borders or acting in its sovereign capacity in dealings with other sovereign governments.  It is quite another to accord sovereign immunity when a tribe is engaged in wholly economic pursuits outside its jurisdiction under the cloak of independent corporate identity.  To deny a citizen of a state recourse for injury under the laws of the state under such circumstances is an affront to our federalist system of dual sovereignty.  "In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998); *see also* Thomas P. McLish, *Tribal Sovereign Immunity:  Searching for Sensible Limits*, 88 Colum. L. Rev. 173, 193 (1988) ("The current breadth with which the doctrine of tribal immunity is applied is inconsistent with the policies that underlie it, and inappropriately denies plaintiffs the ability to seek redress in courts of law.").

¶38        As four members of the Supreme Court have observed, "[t]he problem repeats itself every time a tribe . . . harms a tort victim, breaches a contract, or otherwise violates state laws, and tribal immunity bars the only feasible legal remedy." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 824 (2014) (Thomas J., joined by Scalia, Ginsburg, & Alito, J.J., dissenting).  Given its displacement of legal protections that are central to the states' role in our constitutional system and its denial of relief to innocent victims of

wrongdoing, I hope the Supreme Court will reconsider the contours of tribal immunity currently binding us. *See id.* at 814 (stating the expansion of tribal immunity in *Kiowa* was "error" and "an affront to state sovereignty"); *Kiowa,* 523 U.S. at 758 ("There are reasons to doubt the wisdom of perpetuating the doctrine. . . . In our interdependent and mobile society, . . . tribal immunity extends beyond what is needed to safeguard tribal self-governance."); *Kiowa,* 523 U.S. at 766 (Stevens, J., dissenting) ("[T]he rule is unjust. It is especially so with respect to tort victims who have no opportunity to negotiate for a waiver of sovereign immunity."); *Puyallup Tribe, Inc. v. Dep't. of Game*, 433 U.S. 165, 178–79 (1977) (Blackmun, J., concurring) (the doctrine of tribal sovereign immunity "may well merit re-examination in an appropriate case").